******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ROBERT PARKER ET AL. *v.* ZONING COMMISSION OF THE TOWN OF WASHINGTON ET AL.
## (AC 44130)

Elgo, Moll and Sheldon, Js.

*Syllabus*

The plaintiffs, owners of real property located within 100 feet of that of the defendant W Co., appealed to the Superior Court from the decision of the defendant Zoning Commission of the Town of Washington granting W Co.'s application to modify a special permit for the construction of an inn. W Co.'s predecessor in title, W, had sought a special permit in 2008 to construct the inn. The commission denied the request in 2011, and W appealed to the Superior Court. While the appeal was pending, the commission granted W a special permit to operate a school on the property. The Superior Court thereafter upheld the commission's denial of the request for the special permit to construct the inn, and W appealed to this court. While W's appeal was pending before this court, the parties in that appeal entered into a settlement agreement in 2013 that permitted W to pursue construction of the inn, known as the main building, and associated appurtenances. The settlement agreement also contained sixteen conditions regarding the construction, and W agreed to surrender the special permit approval that it had obtained for a school. At a special meeting in January, 2013, the commission approved the settlement agreement and incorporated into it a 2012 revision of an architect's site plan for the inn, two architectural renderings and conditions that were contained in the special permit approval for the school. Thereafter, a motion for approval of the settlement agreement was filed with the Superior Court pursuant to statute (§ 8-8 (n)). The court approved the settlement agreement, thereby memorializing W's ability to construct the inn. W Co. then filed its application with the commission to modify the special permit that was approved in the commission's special meeting. The application was accompanied by, inter alia, a new site development plan for the inn that was revised to 2018. The commission conducted a hearing during which members of the public opined that the 2018 site development plan constituted an expansion of the nonconforming structure that was memorialized in the 2012 plan and approved as part of the settlement agreement. The commission thereafter approved W Co.'s application to modify the special permit in accordance with the 2018 site development plan and attached twenty-five conditions to that approval. The plaintiff property owners appealed to the Superior Court, claiming, inter alia, that the commission improperly authorized the expansion of a nonconforming structure and a nonconforming use in contravention of the zoning regulations. The court rejected that contention and dismissed the plaintiffs' appeal, concluding that the commission had substantial evidence before it to approve and modify W Co.'s application. On the granting of certification, the plaintiffs appealed to this court. *Held*:

1. The plaintiffs could not prevail on their claim that the Superior Court improperly concluded that the commission's approval of W Co.'s special permit modification did not constitute an impermissible expansion of a nonconforming structure:

   a. Although the main building depicted in the 2012 site plan did not satisfy the common-law standard for a nonconforming use, insofar as it did not comply with the lot line setback requirements in the zoning regulations and was not in existence in 2012 when it was merely a contemplated use of the property, because the commission and the court ratified the settlement agreement and all statutory requirements were satisfied, the proposed main building constituted a lawful, albeit nonconforming, structure that could not be expanded or enlarged within the setback area in the absence of a variance from the town's Zoning Board of Appeals.

   b. The plaintiffs' claim that the commission authorized an impermissible vertical expansion of the nonconforming main building was unavailing, notwithstanding the plaintiffs' assertion that a height limitation could

be found in W's proposed plan for the school and sewage discharge plans W had submitted for state approval: the Superior Court properly determined that the commission did not authorize an impermissible expansion when it approved W Co.'s special permit modification, as the plans for the school and sewer discharge were not part of the settlement agreement, which described the 2012 site development as the complete site plan, and the settlement agreement did not specify a height limitation, which was never discussed at the special meeting; moreover, the architectural renderings did not contain dimensions or numerical specifications, the record contained no indication that the commission considered those renderings as accurate depictions of the height of the proposed main building, and the commission was entitled to credit testimony that the architectural renderings were offered merely for illustrative purposes and that the parties to the settlement agreement did not undertake to create a comprehensive agreement; furthermore, contrary to the plaintiffs' contention, the commission did not authorize an expansion of the floor area or volume of the main building, as the settlement agreement did not contain a restriction as to the floor area or volume of the main building, and the commission members who approved W Co.'s application to modify the special permit in 2018 and were members of the commission in 2013 when it approved the settlement agreement were entitled to rely on their personal knowledge of the settlement agreement and the special meeting.

2. The plaintiffs could not prevail on their claim that the Superior Court improperly concluded that W Co.'s special permit application did not constitute an impermissible expansion of a nonconforming use, which was based on their assertions that only accessory uses mentioned in the settlement agreement were permitted and that the inclusion of a bar, a prefunction meeting area and a meeting room/library were not permitted accessory uses: the record contained substantial evidence that the parties to the settlement agreement did not intend to restrict accessory uses to only those specifically mentioned in the settlement agreement and did not include floor plans that depicted the uses contemplated for the interior of the main building, as the transcript of the special meeting contained no discussion of the scope of accessory uses, no floor plans were presented at that hearing, and the commission heard testimony from a party to the settlement agreement, which it was entitled to credit, that the parties to that agreement never undertook to create a comprehensive agreement; moreover, the bar, prefunction meeting area and meeting room/library were permitted accessory uses, as the commission reasonably could have found that those uses had commonly, habitually and by long practice been established as reasonably associated with the primary use of an inn in Washington, the commission used the only existing inn in town as a de facto model of what the term "inn" meant, as the zoning regulations did not define "inn," there was uncontroverted evidence that the existing inn featured a bar, libraries and meeting areas, and the commission reasonably could have found that W Co.'s use of the property would not result in a substantial difference in effect on the surrounding neighborhood, there having been evidence that all of the accessory uses W Co. proposed were typical of what inns do and that the proposed uses were of a smaller scale than those at the existing inn; furthermore, the proposed accessory uses in the settlement agreement were the same as those approved in the commission's granting of W Co.'s motion to modify the special permit, and the commission required as a condition of its approval of the special permit modification that the approval was subject to all of the conditions and limitations in the settlement agreement as well as the more restrictive limitations the commission imposed in its approval of the settlement agreement.

3. The plaintiffs' claim that the Superior Court failed to require compliance with the special permit standards in the zoning regulations was unavailing, as the plaintiffs failed to rebut the strong presumption of regularity that attaches to the conduct of zoning commissions: the commission reasonably could have concluded that W Co.'s proposed use of the property comported with the intent and objectives of the zoning regulations and the town's plan of conservation and development, and was in harmony with the orderly development of the town and surrounding neighborhood; moreover, the zoning regulations previously had authorized use of the property as an inn, the settlement agreement plainly permitted the use of the property in that manner and provided a mechanism for modification of the plans contained in that agreement, and,

although the commission did not render an official, collective statement of reasons for its action, as required by statute (§ 8-3c (b)), noncompliance with that imperative was commonplace and condoned by decades of appellate authority; furthermore, the commission gave ample attention to the propriety and the impact of W Co.'s proposed use of the property, the commission was cognizant of the fact that the only other inn in Washington had featured comparable primary and accessory uses for decades, the commission was well aware of the protracted procedural history of the proposed use, and the changes in the special permit application did not materially alter those considerations.

Argued March 15, 2021—officially released January 11, 2022

*Procedural History*

Appeal from the decision of the named defendant granting the application of the defendant 101 Wykeham Road, LLC, for the modification of a special permit for the construction of an inn, and for other relief, brought to the Superior Court in the judicial district of Litchfield at Torrington and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, the case was tried to the court, *Bellis, J.*; judgment dismissing the appeal, from which the plaintiffs, on the granting of certification, appealed to this court. *Affirmed.*

*Gail E. McTaggart*, for the appellants (plaintiffs).

*Michael A. Zizka*, for the appellee (named defendant).

*Paul V. Gelderman*, for the appellee (defendant Erika Klauer et al.).

*Teresa R. Peacocke*, self-represented, the appellee (defendant).

*Opinion*

ELGO, J. The plaintiffs, Robert L. Parker, Peter E. Rogness, and Randi M. Solomon, trustee for the Randi M. Solomon Revocable Trust, appeal from the judgment of the Superior Court denying their appeal from the decision of the defendant Zoning Commission of the Town of Washington (commission) to grant the application of the defendant 101 Wykeham Road, LLC (applicant), to modify a special permit previously approved by the commission in 2013 pursuant to a settlement agreement.[1] On appeal, the plaintiffs claim that the court improperly concluded that the application did not constitute an impermissible expansion of both a nonconforming structure and a nonconforming use. The plaintiffs further claim that the court "failed to require compliance with [the] special permit standards" contained in the Washington Zoning Regulations (regulations).[2] We affirm the judgment of the Superior Court.[3]

This appeal concerns the development of a 26.9 acre parcel of real property owned by the applicant and known as 101 Wykeham Road in Washington (property). The property is located in the "R-1 Farming and Residential" zoning district.[4] Among the uses authorized by special permit in that zone is an "Inn or Tourist home." Washington Zoning Regs., § 4.4.1. The regulations, however, provide no definition of the terms "inn" or "tourist home."

In May, 2008, an entity known as Wykeham Rise, LLC (Wykeham), the predecessor in title to the applicant, applied for a special permit to construct an "inn and associated appurtenances" on the property. Following a lengthy hearing over the course of several months, the commission, by a vote of three to two, denied that application.[5] Wykeham appealed from that decision to the Superior Court, claiming that (1) the commission lacked a valid reason for its denial, and (2) the commission's decision must be reversed due to the improper participation of alternate members in its deliberations and the improper predetermination of the merits of the application by one regular member of the commission.

While that appeal was pending before the Superior Court, Wykeham alternatively sought special permit approval to operate a school on the property,[6] and it is undisputed that the commission granted such approval. Although the record before this court is voluminous and contains materials that reference "Wykeham University," it does not contain copies of any such special permit applications or the commission's formal decision to approve such a special permit. The record nonetheless indicates that Wykeham agreed, as a condition to the settlement agreement at issue in this appeal, to surrender the special permit approval that it had obtained for a school once the settlement agreement was ratified. See footnote 7 of this opinion.

In October, 2011, the Superior Court issued its memorandum of decision on Wykeham's appeal from the commission's denial of its request for a special permit to construct an inn on the property. The court concluded that none of Wykeham's claims constituted reversible error. At the same time, the court noted its concern about the conduct of the commission, stating in relevant part: "The court observes . . . that certain commission members engaged in a level of conduct that skirted the boundaries of what is appropriate for municipal public officials sitting on a commission. First, during the course of the five public hearings held on Wykeham's application . . . Commissioner [Valerie] Friedman made observations and comments that might lead one to believe that the application was being predetermined and prejudiced in such a way that the principles of fundamental fairness during the proceedings were being undercut. . . . The court finds that . . . Commissioner Friedman, as a sitting member of the commission, created the appearance, in form, if not in substance, of predetermination and, therefore, contradicted the spirit of the statutory mandate of General Statutes § 8-11. The court further observes that the participation by [two] alternate commission members . . . in the deliberative process by way of comment or submission on why the application should be denied, was inappropriate." The court concluded with the following admonition: "The court . . . strongly advises that Chairman [David] Owen, along with all of the commissioner members, should undertake some remedial training and orientation concerning their duties as municipal public officials sitting on boards and commissions, including their obligation to remain impartial and nonjudgmental during such proceedings, and to withhold judgment until all of the evidence and arguments have been presented for their deliberation." *Wykeham Rise, LLC* v. *Zoning Commission*, Superior Court, judicial district of Litchfield, Docket No. CV-09-4007939-S (October 11, 2011).

Wykeham then filed a petition for certification, seeking appellate review of the propriety of that judgment, which this court granted. In addition to Wykeham and the commission, the parties to that appeal included three neighboring property owners—Eric A. Federer, Wendy R. Federer, and Teresa Rosen Peacocke.

While that appeal was pending, the parties settled their differences and entered into an agreement dated January 9, 2013 (settlement agreement). That settlement agreement noted that Wykeham "desires to construct and operate an inn" on the property and then set forth sixteen "terms and conditions by and under which neither [the Federers] nor Peacocke would oppose Wykeham in its efforts to obtain [c]ommission approval [of] an [i]nn on the [p]roperty."[7] At a special meeting held on January 7, 2013,[8] the commission, by

a vote of four to one, approved the settlement agreement "per the site development plan by Arthur H. Howland and Associates, dated July 8, 2011, revised to December 17, 2012, 32 sheets" (2012 plan). The commission also incorporated by reference into its approval "[t]he architectural renderings [marked] 'A' and 'B' "[9] and six conditions of approval that were contained in its previous special permit approval to operate a school on the property.[10]

Following the commission's approval of the settlement agreement, a motion for approval was filed with the Superior Court pursuant to General Statutes § 8-8 (n), as the appeal of the commission's 2008 decision to deny Wykeham's special permit request remained pending.[11] Through legal counsel, the plaintiffs in the present action—who were not parties to the settlement agreement or the proceeding before the Superior Court—opposed the settlement agreement.[12] After hearing from all interested parties, the court concluded that the settlement agreement "reflects honest, good faith compromise on the part of all parties to this appeal." *Wykeham Rise, LLC* v. *Zoning Commission*, Docket No. CV-09-4007939-S, 2013 WL 951156, *1 (Conn. Super. February 5, 2013). The court further emphasized that "[t]he settlement reflects a substantially reduced project, which should be much more acceptable to the neighbors. The settlement includes the following: (1) the removal of some buildings which were part of the original proposal; (2) reduced parking; (3) reduced restaurant; (4) a prohibition on amplified music; (5) closure of one means of access and egress; (6) limitation on the number of events which can be held; [and] (7) plantings to screen the activities of the project." Id. Accordingly, the court approved the settlement agreement, thereby memorializing Wykeham's ability to construct an inn on the property, as depicted on the 2012 plan.[13] See footnote 7 of this opinion.

The settlement agreement also contemplates modification of the 2012 plan. In this regard, the agreement requires that "[a]ny amendments to this [s]ettlement [a]greement must be consented to by all the parties herein or their heirs, successors or assigns." The settlement agreement further provides that "[a]ll modifications to the approved plans must be approved by the [commission] or its authorized agent prior to implementation."

On March 22, 2018, the applicant, as successor in title to the property, filed an application for the "modification of [the] existing special permit" that had been approved by the commission at its January 7, 2013 special meeting (modification application). That application was accompanied by several documents, including a new site development plan prepared by Arthur H. Howland & Associates, P.C., dated December 2, 2016, revised to February 5, 2018 (2018 plan),[14] a copy of the

applicant's February 8, 2018 application for a building permit and related documentation,[15] and copies of both the settlement agreement and the commission's January 7, 2013 approval thereof.[16]

In accordance with the instructions provided by the commission on its special permit application form, the application also included a written description of the proposed modification. In that correspondence, the applicant's legal counsel stated in relevant part: "The [a]pplicant's goal is to build the [i]nn that it is entitled to build as a result of the settlement agreement reached with the [commission] in January of 2013 and approved by the court on February 5, 2013. To do that, the [a]pplicant [is requesting] a modification to the [2012 plan] incorporated into the [s]ettlement [a]greement. This modification is in part necessary in order to comply with newer building code requirements for fire egress. It is also discretionary in part as the [a]pplicant wishes to add grading and stone walls in the rear of the main building. . . . It is noted that there is an inconsistency between the [2012 plan] footprint . . . which defines the footprint of the main building, and [r]enderings A & B, (incorporated into the [commission's] approval of the [s]ettlement [a]greement). To wit, the footprint of the [r]enderings (to the extent that it is discernable) does not comply with the [s]ettlement [a]greement/ [2012 plan]. Understanding the limited purpose of the [r]enderings was merely to demonstrate the architectural style of the main building, the [s]ettlement [a]greement/[2012 plan] was used for the footprint and the [r]enderings for the architectural [style; therefore, the] plans submitted substantially comply with both."

The commission held a public hearing on the modification application on April 17, and July 19 and 23, 2018, at which it received documentary and testimonial evidence.[17] One contentious issue concerned the applicant's proposal to permit individual ownership of guest room units at the inn, as multifamily housing was not permitted under the regulations. Another major issue with the 2018 plan was the proposed addition of a 2000 square foot ballroom and parking concerns related thereto. Some members of the public also opined that the 2018 plan constituted an expansion of the nonconforming structure memorialized in the 2012 plan and approved as part of the settlement agreement. In response, Peacocke, who had opposed Wykeham's 2008 special permit application and who was a party to the settlement agreement, stated at the public hearing: "I just [want] to remind members of the commission . . . that there were four attorneys who negotiated and drafted the [settlement agreement]. If we had intended to create an exclusionary agreement itemizing all and only those matters, we'd have said so, and we didn't. . . . [W]e . . . never undertook to create a comprehensive agreement . . . ."

The commission also was presented with evidence as to how the applicant's proposal compared with the Mayflower Inn, which was located "right down the road" from the property and was "the only inn in [Washington]" at that time. Commission members were reminded that, because the regulations do not define the term "inn," the commission had "repeatedly said [that] it uses the Mayflower Inn . . . as a de facto model of what [constitutes] an inn . . . in Washington." Due to the similarity of the Mayflower Inn to the applicant's proposal, Paul S. Szymanski, a civil engineer, testified that the Mayflower Inn provided "a wonderful basis for comparison," and the commission was presented with evidence as to how the applicant's proposal compared with that existing inn.[18]

The commission deliberated the merits of the applicant's modification request over the course of three nights on August 7, 27 and 28, 2018. At the conclusion of those deliberations, the commission, by a vote of three to two, approved the application to modify the existing special permit in accordance with the 2018 plan.[19] The commission attached twenty-five detailed conditions to that approval.[20] See General Statutes § 8-2 (a) (special permits may be subject "to conditions necessary to protect the public health, safety, convenience and property values"); *Carpenter* v. *Planning & Zoning Commission*, 176 Conn. 581, 594, 409 A.2d 1029 (1979) (§ 8-2 "expressly" provides that municipal "commission[s] [are] authorized to impose conditions as a prerequisite to certain uses of lands"); *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, 176 Conn. App. 570, 576, 170 A.3d 73 (2017) ("in granting a special permit, the commission has the authority to place reasonable restrictions on the proposed use"). Notably, the commission prohibited both the proposed ballroom and individual ownership of guest room units. See footnote 20 of this opinion. Although the commission did not provide a collective statement of the basis of its decision,[21] the motion it granted to approve the modification application concluded by stating: "The [c]ommission finds that all of the foregoing conditions must be met in order for the proposed use to be successfully accommodated on the chosen site in accordance with the applicable [regulations]. Therefore, if a court should determine that any of the foregoing conditions are invalid or unlawful, this approval shall be null and void . . . ."

The plaintiffs, all of whom are owners of property located within 100 feet of the applicant's property,[22] filed a timely appeal with the Superior Court, challenging the propriety of the commission's decision to grant the modification application. The plaintiffs claimed, among other things, that the commission improperly authorized the expansion of both a nonconforming structure and a nonconforming use in contravention of

the regulations. The court rejected that contention and further concluded that the commission "had substantial evidence to approve and modify the application and did so only after imposing certain conditions to protect the public health and safety. The court finds that the commission did not act arbitrarily or illegally . . . ." Accordingly, the court dismissed the appeal.

The plaintiffs thereafter filed a petition with this court for certification to appeal pursuant to § 8-8 (o).[23] We granted the plaintiffs' petition, and this appeal followed.

Before considering the claims advanced by the plaintiffs in this appeal, we note certain well established principles. "[T]he function of a special permit is to allow a property owner to use his property in a manner expressly permitted under the zoning regulations, subject to certain conditions necessary to protect the public health, safety, convenience, and surrounding property values. . . . The basic rationale for the special permit [is] . . . that while certain [specially permitted] land uses may be generally compatible with the uses permitted as of right in particular zoning districts, their nature is such that their precise location and mode of operation must be regulated because of the topography, traffic problems, neighboring uses, etc., of the site." (Citation omitted; internal quotation marks omitted.) *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. App. 585–86.

Judicial review of a commission's decision to grant or deny a special permit must be mindful of "the significant discretion that a commission is afforded . . . . In reviewing a decision of a zoning [commission], a reviewing court is bound by the substantial evidence rule, according to which . . . [c]onclusions reached by [a zoning] commission must be upheld by the [Superior Court] if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the [Superior Court] would have reached the same conclusion . . . but whether the record before the [commission] supports the decision reached. . . . If [the Superior Court] finds that there is substantial evidence to support a zoning [commission's] findings, it cannot substitute its judgment for that of the [commission]. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. . . . Moreover, [s]ubstantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . .

"[T]he substantial evidence standard is highly defer-

ential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . In light of the significant amount of deference that the substantial evidence standard affords a commission, the court has described it as an important limitation on the power of the courts to overturn a decision of an administrative agency . . . [that] provide[s] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [O]n appeal, judicial review [of a commission's denial of a special permit application] is confined to the question of whether the commission abused its discretion in finding that an applicant failed to demonstrate compliance with the requirements of applicable zoning regulations. *When there is evidence in the record to substantiate the commission's determination, the determination must stand.*" (Citations omitted; emphasis in original; internal quotation marks omitted.) *McLoughlin* v. *Planning & Zoning Commission*, 200 Conn. App. 307, 318–20, 240 A.3d 709, cert. granted, 335 Conn. 978, 241 A.3d 131 (2020). At the same time, when a question of law is presented, such as the proper interpretation of a zoning regulation, our review is plenary. See, e.g., *Reardon* v. *Zoning Board of Appeals*, 311 Conn. 356, 364, 87 A.3d 1070 (2014); *Zimnoch* v. *Planning & Zoning Commission*, 302 Conn. 535, 547, 29 A.3d 898 (2011).

This appeal concerns the alleged expansion of a "nonconforming use," a term of art with both general and specific meaning. In *Munroe* v. *Zoning Board of Appeals*, 75 Conn. App. 796, 818 A.2d 72 (2003), this court, citing a noted treatise on land use in this state, observed that, "[t]he term nonconforming uses is often used without consideration as to what aspect of the use of property is nonconforming, and in determining whether an activity is an expansion or change of a nonconforming use, the nature of the nonconformity is important." (Internal quotation marks omitted.) Id., 806. The court then detailed four distinct types of nonconformity: "(1) nonconforming use—the use of the land or structure on it is nonconforming (e.g., commercial use in a residential zone); (2) a nonconforming lot—the lot is undersized, irregularly shaped, has inadequate width or depth or inadequate frontage; (3) nonconforming building or structure—the structure does not meet the minimum or maximum size requirements, floor area ratio, height or bulk requirements of the existing zoning regulations; (4) nonconformity as to location of structure, i.e., it does not conform with one or more of the setback requirements." (Internal quotation marks omitted.) Id.; see also *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 690 n.20, 111 A.3d 473 (2015). In the present case, the first and fourth types of nonconformity are implicated, as the plaintiffs claim that the commission improperly approved the expansion of both a nonconforming structure and a noncon-

forming use on the property. We address each claim in turn.

## I

We begin with the plaintiffs' contention that the court improperly concluded that the applicant's proposal did not constitute an impermissible expansion of a nonconforming structure. To resolve that claim, we must determine, as a threshold matter, whether the principles that govern nonconforming uses are applicable under the unique facts and circumstances of this case.[24] That inquiry entails consideration of not only the undisputed fact that the alleged nonconformity was the direct result of the settlement agreement ratified by the Superior Court in 2013 but, also, the undisputed fact that, at all relevant times, no structure proposed by the applicant existed on the property, nor had construction of any such structure commenced.

### A

"A nonconformity is a use or structure prohibited by the zoning regulations [that] is permitted because of its existence at the time that the regulations [were] adopted." *Adolphson* v. *Zoning Board of Appeals*, 205 Conn. 703, 710, 535 A.2d 799 (1988). "Where a nonconformity exists, it is a vested right which adheres to the land itself. . . . A vested right . . . to continue the nonconforming use is in the land . . . . [T]he right to a nonconforming use is a property right and . . . any provision of a statute or ordinance which takes away that right in an unreasonable manner, or in a manner not grounded on the public welfare, is invalid. A lawfully established nonconforming use is a vested right and is entitled to constitutional protection." (Citation omitted; internal quotation marks omitted.) *Petruzzi* v. *Zoning Board of Appeals*, 176 Conn. 479, 483–84, 408 A.2d 243 (1979). As this court has noted, "[o]ur General Statutes recognize and protect this bedrock principle." *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 684; see General Statutes § 8-2 (a) (prohibiting municipality from amortizing or eliminating nonconformities through enactment or amendment of zoning regulations); General Statutes § 8-13a (a) (providing statutory protection to certain nonconforming "building[s] or other structure[s]"); General Statutes § 8-26a (b) (3) (providing that change in subdivision or zoning regulations, or boundaries of districts, "shall not alter or affect a nonconforming use or structure as provided in [§] 8-2").

Although the right to continue a nonconforming use is statutorily protected, it is equally well established that, absent extraordinary circumstances warranting variance of the zoning regulations by a municipal zoning board of appeals,[25] such nonconformity cannot be expanded or enlarged. As our Supreme Court has explained, "nonconforming uses should be abolished

or reduced to conformity as quickly as the fair interest of the parties will permit—[i]n no case should they be allowed to increase." (Internal quotation marks omitted.) *Adolphson* v. *Zoning Board of Appeals*, supra, 205 Conn. 710; see also *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 243, 662 A.2d 1179 (1995) ("a nonconforming structure cannot be increased in size in violation of zoning ordinances"); *Blum* v. *Lisbon Leasing Corp.*, 173 Conn. 175, 181, 377 A.2d 280 (1977) (noting "the indisputable goal of zoning to reduce nonconforming to conforming uses with all the speed justice will tolerate"); *Kleinsmith* v. *Planning & Zoning Commission*, 157 Conn. 303, 314, 254 A.2d 486 (1968) ("[t]he advantages which the owners of nonconforming property acquire by the enactment of a zoning ordinance are not to be subsequently augmented except as permitted by the ordinance"); *Guilford* v. *Landon*, 146 Conn. 178, 182, 148 A.2d 551 (1959) ("the accepted policy of zoning . . . is to prevent the extension of nonconforming uses"); *Planning & Zoning Commission* v. *Craft*, 12 Conn. App. 90, 96, 529 A.2d 1328 ("[z]oning regulations in general seek the elimination of nonconforming uses, not their creation or enlargement"), cert. denied, 205 Conn. 804, 531 A.2d 937 (1987). Those principles are memorialized in the regulations at issue here, which provide in relevant part that "[i]t is . . . the intent of these regulations that the nonconforming aspects of [any nonconforming] lots and structures shall not be enlarged, expanded, or extended . . . . A nonconforming use of a structure or lot shall not be extended, expanded, or enlarged . . . ."[26] Washington Zoning Regs., § 17.1.

1

Under the traditional analysis applicable to nonconforming uses, "[f]or a use to be considered nonconforming . . . [it] must possess two characteristics. First, it must be *lawful* and second, it must be *in existence* at the time that the zoning regulation making the use nonconforming was enacted." (Emphasis in original.) *Helicopter Associates, Inc.* v. *Stamford*, 201 Conn. 700, 712, 519 A.2d 49 (1986); see also Washington Zoning Regs., § 17.4 (permitting "a lawfully constructed, but currently nonconforming, structure" to be "continued so long as it remains otherwise lawful"); Washington Zoning Regs., § 17.1 (intent of nonconforming use regulations is to permit nonconforming structures that existed "before the [r]egulations as currently amended were passed" to "continue until they are removed"). The proposed structure in question here, known as the "main building," possesses neither characteristic.

A "lawful" use is one that complied with both "state law" and all zoning regulations that were in effect when the use commenced. *Helicopter Associates, Inc.* v. *Stamford*, supra, 201 Conn. 712. At all relevant times, the applicable regulation governing a "Tourist Home

or Inn" provided in relevant part that "the minimum setback of any structure . . . shall be . . . [fifty] feet from any lot line."[27] Washington Zoning Regs., § 13.9.C. The footprint[28] of the main building, as depicted on the 2012 plan that was incorporated by reference into the settlement agreement, was, at its closest point, to be located thirty-one feet from the property line. That location thus resulted in a nineteen foot intrusion into the setback area. Accordingly, the main building depicted on the 2012 plan cannot be deemed a lawful structure, as it does not comply with the setback requirements of the regulations. See *Helicopter Associates, Inc.* v. *Stamford*, supra, 712.

In addition, to constitute a nonconforming structure under established case law, the main building had to "be *in existence* at the time that the zoning regulation making the use nonconforming was enacted." (Emphasis in original.) Id. The precedent of our Supreme Court instructs that "[t]o be a nonconforming use the use must be actual. It is not enough that it be a contemplated use [or] that the property was bought for the particular use. The property must be so utilized as to be irrevocably committed to that use." (Internal quotation marks omitted.) *Francini* v. *Zoning Board of Appeals*, 228 Conn. 785, 789, 639 A.2d 519 (1994); see also *Karls* v. *Alexandra Realty Corp.*, 179 Conn. 390, 399, 426 A.2d 784 (1980) (explaining that, "to be irrevocably committed to a particular use, there must have been a significant amount of preliminary or preparatory work done on the property prior to the enactment of the zoning regulations which unequivocally indicates that the property was going to be used for that particular purpose"); *Petruzzi* v. *Zoning Board of Appeals*, supra, 176 Conn. 482–83 ("[t]he lot and building in question" qualified as legally protected nonconforming uses because they were in existence prior to enactment of zoning regulations and had not "changed in size or shape"); *Lebanon* v. *Woods*, 153 Conn. 182, 197, 215 A.2d 112 (1965) (because tract of land "was not 'irrevocably committed' to development," it "was not a nonconforming use"); *MacKenzie* v. *Town Planning & Zoning Commission*, 149 Conn. 678, 684, 183 A.2d 619 (1962) ("a contemplated use cannot constitute an actual use"); *Corsino* v. *Grover*, 148 Conn. 299, 308, 170 A.2d 267 (1961) ("[a] proposed use cannot constitute an existing nonconforming use"); *Fairlawns Cemetery Assn., Inc.* v. *Zoning Commission*, 138 Conn. 434, 444, 86 A.2d 74 (1952) (To establish a nonconforming use, "[i]t is not enough that it be a contemplated use, even though plans for that have been put on paper. . . . It is not enough that the property was bought for the particular purpose." (Citations omitted.)); *DeFelice* v. *Zoning Board of Appeals*, 130 Conn. 156, 161, 32 A.2d 635 (1943) ("[a]ctual use as distinguished from merely contemplated use" is required).

Although the main building was a contemplated use

of the property, and its footprint was memorialized in the 2012 plan, there is no basis in the record to conclude that the property was irrevocably committed to that use. There is no evidence that construction of that structure ever commenced, nor has any party so argued. The main building was merely contemplated but did not actually exist. As a result, it does not satisfy the common-law standard for a nonconforming use.

2

That determination does not end our inquiry, as that common-law standard evolved in cases concerning nonconforming uses that "antedate the enactment of zoning" regulations. *Petruzzi* v. *Zoning Board of Appeals*, supra, 176 Conn. 482; see also *Pleasant View Farms Development, Inc.* v. *Zoning Board of Appeals*, 218 Conn. 265, 271–73, 588 A.2d 1372 (1991); *Helicopter Associates, Inc.* v. *Stamford*, supra, 201 Conn. 711; *Poneleit* v. *Dudas*, 141 Conn. 413, 419–20, 106 A.2d 479 (1954); *Lane* v. *Cashman*, 179 Conn. App. 394, 438–39, 180 A.3d 13 (2018); *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 683–87. Given that context, the present case is fundamentally distinct, in that it originates not from a preexisting use on the property but, rather, a settlement agreement regarding a proposed use. That crucial distinction requires us to more carefully consider the precise nature of the use at issue in this appeal.

As one treatise notes, a variety of uses of land are entitled to protection under our law, including special permit uses, nonconforming uses, and "[a]uthorized illegal uses . . . allowed by variance granted by the zoning board of appeals." R. Fuller, 9B Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 52:1, p. 219. The use at issue here—the operation of an inn on the property with a main building partially inside the setback area—technically is not the proper subject of a special permit, as the application did not strictly comply with the setback requirements of § 13.9 of the regulations. It also is not an illegal use authorized by a variance issued by the Zoning Board of Appeals of the Town of Washington. Rather, the use here is something altogether different and is perhaps best described as a lawful use resulting from the approval of a settlement agreement by both the municipal zoning commission and the Superior Court.

"[S]ettlement of disputes . . . is to be encouraged as sound public policy." (Internal quotation marks omitted.) *Yale University* v. *Out of the Box, LLC*, 118 Conn. App. 800, 809 n.7, 990 A.2d 869 (2010). In the context of a municipal land use agency's settlement of a pending appeal, there exists a "powerful interest in the promotion of settlement of litigation by agreement of the parties." *Sendak* v. *Planning & Zoning Commission*, 7 Conn. App. 238, 242, 508 A.2d 781 (1986). Moreover, the statutory requirement that any settlement involving

a municipal land use agency must be approved by the Superior Court following a hearing; see footnote 11 of this opinion; "provides a forum for the presentation of any challenges to a settlement, including any allegations of bad faith, collusion or other improper conduct by the parties to the settlement," and "serves to protect the public interest by guarding against any attempt on the part of the settling parties to evade judicial review and scrutiny by potentially aggrieved landowners." *Brookridge District Assn.* v. *Planning & Zoning Commission*, 259 Conn. 607, 616, 793 A.2d 215 (2002); see also *Willimantic Car Wash, Inc.* v. *Zoning Board of Appeals*, 247 Conn. 732, 742 n.16, 724 A.2d 1108 (1999) (legislative history of § 8-8 (n) "indicates that the requirement of court approval was designed to guard against surreptitious dealing between zoning boards and applicants, to avoid frivolous appeals initiated for 'leverage,' and to ensure that settlements are fair"). That statutory requirement "recognizes . . . the legitimacy of settlement of zoning cases . . . ." *Brookridge District Assn.* v. *Planning & Zoning Commission*, supra, 617.

As was the case in *Brookridge District Assn.*, the settlement agreement in the present case resolved a pending appeal involving the commission and an applicant that had been denied an application for a special permit. See *Wykeham Rise, LLC* v. *Zoning Commission*, supra, 2013 WL 951156. The settlement agreement was formally approved by the commission at a special meeting held on January 7, 2013, and thereafter was approved by the Superior Court following a hearing conducted in accordance with § 8-8 (n). Because all statutory requirements were followed and the settlement agreement was ratified by both the commission and the Superior Court, we agree with the plaintiffs that the proposed main building, as depicted in the 2012 plan, constitutes a lawful use of the property.[29]

Although lawful, the main building does not comply with the setback requirements for structures constructed on property that is used as an inn. At all relevant times, § 13.9.C of the regulations required a fifty foot setback "from any lot line."[30] The regulations define a "nonconforming building" as "[a] building, which does not conform to all the applicable provisions of these [r]egulations." Washington Zoning Regs., § 21.1.49. Because it does not comply with the lot line setback requirements of § 13.9.C of the regulations, the main building is nonconforming under the regulations.

We therefore conclude that the main building depicted in the 2012 plan and incorporated into the settlement agreement constitutes a lawful, albeit nonconforming, structure as a result of the approval of the settlement agreement by the Superior Court. The principles that govern nonconforming uses in this state thus apply to such lawful nonconforming structures. Like any non-

conforming structure, the main building depicted in the 2012 plan cannot be expanded or enlarged within the setback area in the absence of a variance from the Zoning Board of Appeals.

## B

The question, then, is whether the commission improperly authorized the expansion of that nonconforming structure when it approved the modification application in 2018. In its memorandum of decision, the Superior Court concluded that the commission properly determined that the modification application did not constitute an impermissible expansion of a nonconforming structure. Our review of that determination is guided by the substantial evidence standard. See, e.g., *Zachs* v. *Zoning Board of Appeals*, 218 Conn. 324, 329–30, 589 A.2d 351 (1991); *Woodbury Donuts, LLC* v. *Zoning Board of Appeals*, 139 Conn. App. 748, 760 n.11, 57 A.3d 810 (2012).

The regulations prohibit the expansion of nonconforming structures.[31] To determine whether the commission improperly approved the expansion of the nonconforming main building within the setback area, we must determine, as a preliminary matter, the extent of the nonconformity that was memorialized in the 2013 settlement agreement.

## 1

"A settlement agreement . . . is a contract among the parties." *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 532, 4 A.3d 288 (2010). At its essence, a settlement agreement that resolves a pending zoning appeal in accordance with § 8-8 (n) is a stipulated judgment, as it is "a contract of the parties acknowledged in open court and . . . recorded by a court of competent jurisdiction . . . [and] is binding to the same degree as a judgment obtained through litigation . . . ." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Roe*, 246 Conn. 652, 664–65 n.22, 717 A.2d 706 (1998). We thus interpret the settlement agreement before us "according to general principles governing the construction of contracts. . . . [T]he language used [in a contract] must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . [Additionally], in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Citation omitted; internal quotation marks omitted.) *Awdziewicz* v. *Meriden*, 317 Conn. 122, 129–30, 115 A.3d 1084 (2015). Furthermore, "[t]he interpretation of the intention of the parties to the settlement agreement is a question of fact . . . and

we review such a determination by an administrative agency to determine if it is supported by substantial evidence." (Citation omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 219 Conn. 51, 66–67, 591 A.2d 1231 (1991).

The settlement agreement consists of five components: (1) the settlement agreement document itself, which contains sixteen conditions; see footnote 7 of this opinion; (2) the commission's January 7, 2013 approval of the settlement agreement;[32] (3) the 2012 plan, which was incorporated by reference into both the settlement agreement document and the commission's motion to approve the settlement agreement; (4) six additional conditions that the commission attached to its approval; see footnote 10 of this opinion; and (5) the two architectural renderings. See footnote 9 of this opinion.

Those materials contain little in the way of dimensional limitation on the proposed main building. The 2012 plan is pivotal in that regard, as it was incorporated by reference into both the settlement agreement and the commission's approval. The 2012 plan circumscribes the parameters of the footprint of the main building. It is undisputed that the main building depicted in the 2018 plan sat on the same footprint as it did in the 2012 plan and did not intrude farther into the setback area, and the commission was presented with evidence to that effect.[33] Accordingly, there was no horizontal expansion of that lawful nonconforming structure, nor has any party so claimed.

Rather, the plaintiffs claim that the commission improperly approved a vertical expansion of the nonconforming main building. Whether the vertical extension of an existing footprint constitutes an impermissible expansion of a nonconformity depends on the particular language employed in the applicable zoning regulations. See *E & F Associates, LLC* v. *Zoning Board of Appeals*, 320 Conn. 9, 12 n.3, 127 A.3d 986 (2015) (noting that "variances were required because the vertical expansion of the building within the applicable setbacks constituted a prohibited expansion of the nonconforming use under the [Fairfield] zoning regulations"); *Munroe* v. *Zoning Board of Appeals*, supra, 75 Conn. App. 811 (concluding that vertical expansion of nonconforming structure through addition of second story caused "a substantial increase in the nonconformity" in contravention of Branford zoning regulations); *Doyen* v. *Zoning Board of Appeals*, 67 Conn. App. 597, 602, 612, 789 A.2d 478 (vertical expansion of nonconforming structure permitted under Essex zoning regulations), cert. denied, 260 Conn. 901, 793 A.2d 1088 (2002).

The regulations here proscribe the vertical expansion of nonconforming structures.[34] The settlement agreement, however, contains no restriction on the height of the main building. Notably, the 2012 plan does not

specify the height or volume of that building, and neither the conditions included in the settlement agreement document nor the conditions imposed by the commission contain any such dimensions or height restrictions.[35]

Although no height limitation is specified anywhere in the settlement agreement materials, the plaintiffs submit that such a limitation may be found in two other materials, namely, Wykeham's proposed "university" plans from a previous special permit application (school plans) and a set of plans that were submitted to the Department of Energy and Environmental Protection in December, 2012, as part of an application for a general permit to discharge from subsurface sewage disposal systems on the property (discharge permit plans).[36] It nonetheless remains that the commission did not reference the school plans or the discharge permit plans in either its motion to approve the settlement agreement or the conditions attached to its approval. Had the commission wanted to incorporate those plans into its approval of the settlement agreement, it certainly knew how to do so, as it had done with both the 2012 plan and the two architectural renderings. See *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 579, 119 A.3d 570 (2015). In this regard, we note that the settlement agreement document that was before the commission described the 2012 plan as the "complete site plan" for the proposed inn. Yet, the commission chose to incorporate only "the [2012 plan], the [two] architectural renderings . . . and the [six] conditions of approval" into its approval of the settlement agreement. Put simply, the school plans and the discharge permit plans are not part of the settlement agreement that was approved by the commission and the Superior Court.

Although the settlement agreement did incorporate two architectural renderings, those "representative" renderings do not contain any dimensions or numerical specifications. Moreover, the transcript of the January 7, 2013 special meeting indicates that those renderings were offered merely for illustrative purposes regarding the design of the main building. See footnote 9 of this opinion. There is no indication whatsoever in the record before us that the commission considered those renderings as accurate depictions of the height of the proposed main building; indeed, the height of the main building never was discussed at the commission's January 7, 2013 special meeting.

At the public hearing held on the modification application five years later, Reese Owens, an architect, opined that the height of the main building that was approved as part of the settlement agreement could be extrapolated from a comparison of the architectural renderings and the discharge permit plans.[37] Although that may be true, there is no indication in the record before us that commission members in 2013 ever made

that comparison or intended to impose a height restriction on the main building stemming therefrom. We reiterate that the height of the main building was a topic never broached at the January 7, 2013 special meeting.

Moreover, the commission heard testimony at the 2018 public hearing from Szymanski, a civil engineer who (1) was involved in the drafting of both the 2012 and 2018 plans, (2) had participated in the 2013 special meeting, and (3) offered the architectural renderings in response to a question from the commission's administrative assistant as to the design of the main building. Szymanski unequivocally stated at the 2018 public hearing that the architectural renderings were provided simply to illustrate "the architectural style" of the main building. The commission, as the sole arbiter of credibility, was entitled to credit that testimony.[38] See, e.g., *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 443, 941 A.2d 868 (2008).

The commissioners also were presented with uncontroverted evidence that the settlement agreement was a compromise between the parties intended to resolve the pending appeal of the denial of Wykeham's special permit application, to which the commission was a party. In addition, the commission heard testimony from Peacocke, who also was a party to the settlement agreement. Peacocke stated: "I just [want] to remind members of the commission . . . that there were four attorneys who negotiated and drafted the [settlement agreement]. If we had intended to create an exclusionary agreement itemizing all and only those matters, we'd have said so, and we didn't. . . . [W]e . . . never undertook to create a comprehensive agreement . . . ." As our Supreme Court has observed, "[w]e will not insert limitations into a contract when the parties did not do so themselves. . . . This is especially so when, as here, the agreement is between sophisticated . . . parties represented by counsel. . . . In these circumstances, we presume the parties used definitive language to describe their agreement." (Citations omitted.) *Salce* v. *Wolczek*, 314 Conn. 675, 690–91, 104 A.3d 694 (2014); see also *Williams* v. *Lilley*, 67 Conn. 50, 59, 34 A. 765 (1895) ("[w]e assume no right to add a new term to a contract"). Those maxims apply here, as the settlement agreement was crafted by multiple attorneys and subjected to scrutiny at hearings before both the municipal zoning commission and the Superior Court.

That settlement agreement contains no height limitation on the main building, and the record does not reveal an intent on the part of the commission to impose such a restriction in 2013. There is substantial evidence from which the commission, in approving the modification application in 2018, reasonably could conclude that no height restriction was intended to be included in the settlement agreement. We therefore reject the plaintiffs'

claim that the commission improperly approved the vertical expansion of a nonconforming structure.

For those same reasons, the plaintiffs' claim that the commission improperly approved an expansion of the floor area or volume of the main building is unavailing. Significantly, no floor plans were included in the settlement agreement. Moreover, no floor plans were presented to the commission in its review of the settlement agreement. The January 7, 2013 transcript indicates that the floor area and volume of the main building were never discussed at the special meeting.

The settlement agreement likewise does not contain a restriction as to the floor area or volume of the main building. It is noteworthy that the settlement agreement *does* specifically address the maximum floor area of a different structure proposed on the property. Paragraph five of the settlement agreement states in relevant part: "The Inn's spa and fitness center will be limited to the area within the building that is labeled 'Fitness Building' on the Site Plan and cannot exceed floor area totaling more than 11,400 square feet SAVE THAT a single exercise room no larger than 3,800 square feet and containing only exercise equipment may be located within the 'Main Building,' labeled as such as depicted on the Site Plan. If the single exercise room is located in the Main Building, the size of the Fitness Building would then be reduced by the same amount so that the combined floor area devoted to spa and fitness facilities in the Fitness Building and Main Building cannot exceed 11,400 square feet in total." That restriction demonstrates that the parties to the settlement agreement were mindful of floor area considerations and knew how to incorporate such restrictions into that contract. They nevertheless did not include a floor area limitation for the main building in the settlement agreement, and we decline to insert such a limitation into that contract now. See, e.g., *Salce* v. *Wolczek*, supra, 314 Conn. 690–91 ("[w]e will not insert limitations into a contract when the parties did not do so themselves"); *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 171 Conn. App. 61, 279 n.104, 156 A.3d 539 (2017) ("if the parties had intended that the [contract] would provide defense coverage . . . they easily could have said so expressly"), aff'd, 333 Conn. 343, 216 A.3d 629 (2019).

We also note that all three commissioners who voted to approve the modification application in 2018 were members of the commission when it approved the 2013 settlement agreement. See footnote 19 of this opinion. Those commission members were entitled to rely on their personal knowledge of the settlement agreement and the January 7, 2013 special meeting. See, e.g., *Frito-Lay, Inc.* v. *Planning & Zoning Commission*, 206 Conn. 554, 570, 538 A.2d 1039 (1988) ("commission members may legitimately utilize their personal knowledge in reaching a decision"); *Burnham* v. *Planning & Zoning*

*Commission*, 189 Conn. 261, 267, 455 A.2d 339 (1983) ("members of [a zoning commission] are entitled to take into consideration whatever knowledge they acquire by personal observation"); *Atlantic Refining Co.* v. *Zoning Board of Appeals*, 150 Conn. 558, 562, 192 A.2d 40 (1963) ("[o]bviously, the members of the board had personal knowledge of the situation, and they were entitled to take that knowledge into consideration"). One of those members, Nicholas N. Solley, voted against the approval of the settlement agreement in 2013. During deliberations on the 2018 modification application, another member who was not on the commission in 2013 stated to Solley, "You were there [in 2013] . . . and I would like to hear . . . what you were thinking" at that time. In response, Solley noted that, in considering the settlement agreement in 2013, the commission "didn't even deliberate over . . . any elevations or any . . . floor plans" and stated that the commission "never approved specific floor plans."[39] Solley also stated that, for purposes of comparing the 2018 plan to the settlement agreement, "we simply have no baseline from which to, other than [the 2012] plan, from which to draw a comparison . . . ." Commissioner David Werkhoven, who also was a member of the commission in 2013, similarly stated that the commission "never discussed volume requirements" during the special meeting to approve the settlement agreement. Werkhoven further noted that a "floor plan shows you rooms and how they're divided . . . . We didn't . . . get any of that. . . . We didn't talk about that. . . . We talked about the general outline of the [main] building. . . . We didn't say how they could use it or how they couldn't use it." In voting to approve the modification application, those commissioners were free to rely on their personal knowledge of the 2013 settlement agreement proceeding.

On our review of the record, we conclude that substantial evidence exists from which the commission could conclude that no floor area or volume restrictions were included in the settlement agreement. The Superior Court thus properly determined that the commission did not authorize an impermissible expansion of a nonconforming structure when it approved the modification application.

## II

The plaintiffs also claim that the court improperly concluded that the applicant's proposal did not constitute an impermissible expansion of a nonconforming use. We disagree.

The following additional facts are relevant to that claim. Subsequent to the commission's approval of the settlement agreement, the regulations were amended to require at least 500 feet of frontage "on a state highway" for any "Tourist Home or Inn"; see Washington Zoning Regs., § 13.9.B; which the property here conced-

edly lacks. As a result, the operation of an inn on the property is a nonconforming use. Although that nonconforming use is entitled to protection under state law; see General Statutes §§ 8-2 (a) and 8-26a; it cannot be expanded under established precedent and §§ 17.1 and 17.3.A of the regulations. See part I A of this opinion.

A

On appeal, the plaintiffs contend that the commission, in granting the modification application, improperly expanded the scope of that nonconforming use. They argue that only those accessory uses specifically mentioned in the settlement agreement are permitted on the property. See footnote 7 of this opinion. The commission counters that the settlement agreement neither explicitly nor implicitly limited the scope of permissible accessory uses. We agree with the commission.

The regulations in the present case define an "accessory use" as "[a] use customarily incidental and subordinate to a main use and located on the same lot with such main use." Washington Zoning Regs., § 21.1.7; see also *O & G Industries, Inc.* v. *Planning & Zoning Commission*, 232 Conn. 419, 421 n.1, 655 A.2d 1121 (1995) ("[a]ccessory uses are, by definition, uses located on the same lot, and must be subordinate and customarily incidental to, the principal use" (internal quotation marks omitted)). The regulations do not contain an explicit list of permitted accessory uses for inns in Washington. At the same time, the regulations define a "lot" in relevant part as a "parcel of land occupied or capable of being occupied by one principal building and the accessory buildings or uses customarily incidental to it . . . ." Washington Zoning Regs., § 21.1.38. The parties agree that accessory uses are permitted on a lot used principally as an inn. They disagree about the extent to which the settlement agreement here limits accessory uses on the property.

As we have noted, the proper construction of a settlement agreement is governed by principles of contract interpretation. See part I B 1 of this opinion. "A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) *Santos* v. *Massad-Zion Motor Sales Co.*, 160 Conn. App. 12, 18, 123 A.3d 883, cert. denied, 319 Conn. 959, 125 A.3d 1013 (2015).

The settlement agreement here lacks any language addressing accessory uses generally or indicating that unspecified accessory uses are prohibited on the property. At the same time, the settlement agreement does

contain explicit limitations on three accessory uses, namely, the proposed restaurant,[40] the proposed spa and fitness center,[41] and tented events held on the property.[42] No other accessory uses are specified in that agreement. Because the settlement agreement is susceptible to more than one reasonable interpretation as to the scope of permitted accessory uses, we agree with the commission that the settlement agreement is ambiguous in that regard.

"When a contract is ambiguous the [finder of fact] must consider extrinsic evidence and make factual findings as to the parties' intent." *Chiulli* v. *Chiulli*, Superior Court, judicial district of Hartford, Docket No. CV-12-6036551-S (July 8, 2014) (reprinted at 161 Conn. App. 639, 650, 127 A.3d 1147), aff'd, 161 Conn. App. 638, 127 A.3d 1146 (2015). "The interpretation of the intention of the parties to the settlement agreement is a question of fact . . . and we review such a determination by an administrative agency to determine if it is supported by substantial evidence." (Citation omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, supra, 219 Conn. 66–67.

The record before us contains evidence to substantiate a finding that the parties did not intend to restrict accessory uses on the property to only those addressed in the settlement agreement. Although the record indicates that the parties deliberately incorporated specific plans into that agreement, such as the 2012 plan and the architectural renderings, they did not include any floor plans depicting the uses contemplated for the interior areas of the main building.[43] The transcript of the January 7, 2013 special meeting contains no discussion of the scope of accessory uses on the property, and the main building in particular, nor were any floor plans presented at that hearing. In addition, the commission heard testimony during the public hearing on the modification application from Peacocke, who was a party to the settlement agreement. Peacocke emphasized that "there were four attorneys who negotiated and drafted the [settlement agreement]. If we had intended to create an exclusionary agreement itemizing all and only those matters, we'd have said so, and we didn't. . . . [W]e . . . never undertook to create a comprehensive agreement . . . ." The commission was entitled to credit that testimony by a party to the settlement agreement. See, e.g., *Gerlt* v. *Planning & Zoning Commission*, 290 Conn. 313, 322, 963 A.2d 31 (2009) (assessing credibility of witnesses is sole province of zoning commission); see also *Landry* v. *Spitz*, 102 Conn. App. 34, 49 n.9, 925 A.2d 334 (2007) ("[t]his court will not revisit credibility determinations" in case regarding interpretation of settlement agreement).

The substantial evidence standard "is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of

review." (Internal quotation marks omitted.) *Palomba-Bourke* v. *Commissioner of Social Services*, 312 Conn. 196, 202, 92 A.3d 932 (2014). On our review of the whole record, we conclude that substantial evidence exists to support a finding that the parties to the settlement agreement did not intend to restrict accessory uses on the property to only those specifically mentioned therein.

B

We turn next to the question of whether the uses at issue constitute permissible accessory uses. On appeal, the plaintiffs maintain that the inclusion of a bar, a "prefunction" meeting area, and a "meeting room/ library" in the 2018 plan approved by the commission are not permitted accessory uses for inns in Washington.[44] We do not agree.

"[I]n the land use context, the term 'accessory use' traditionally connotes a relationship with the primary use." *Morgenbesser* v. *Aquarion Water Co. of Connecticut*, 276 Conn. 825, 831, 888 A.2d 1078 (2006). As our Supreme Court has explained, "[a]n accessory use is determined specifically by reference to the primary use of the property to which it is incidental." *Loring* v. *Planning & Zoning Commission*, 287 Conn. 746, 767, 950 A.2d 494 (2008). "[An] accessory use [is] a use which is customary in the case of a permitted use and incidental to it. . . . An accessory use under a zoning law is a use which is dependent on or pertains to the principal or main use. . . . The word incidental as employed in a definition of accessory use incorporates two concepts. It means that the use must not be the primary use of the property but rather one which is subordinate and minor in significance. . . . But incidental, when used to define an accessory use, must also incorporate the concept of reasonable relationship with the primary use. It is not enough that the use be subordinate; it must also be attendant or concomitant. To ignore this latter aspect of incidental would be to permit any use which is not primary, no matter how unrelated it is to the primary use. . . . In examining the use in question, it is not enough to determine that it is incidental in the two meanings of that word as discussed [previously]. The use must be further scrutinized to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use. . . . In situations where there is no . . . specific provision in the ordinance, the question is the extent to which the principal use as a matter of custom . . . carries with it an incidental use so that as a matter of law, in the absence of a complete prohibition of the claimed incidental use in the ordinance, it will be deemed that the legislative intent was to include it." (Internal quotation marks omitted.) Id., 753–54.

"[W]hether a particular use qualifies as an accessory use is ordinarily a question of fact for the zoning author-

ity, to be determined by it with a liberal discretion." (Internal quotation marks omitted.) *Clifford* v. *Planning & Zoning Commission*, 280 Conn. 434, 451, 908 A.2d 1049 (2006). On appeal, a zoning commission's determination "is subject to a very narrow, deferential scope of review"; id.; and must be sustained if there is substantial evidence in the record to support it. Id., 452; see also *Loring* v. *Planning & Zoning Commission*, supra, 287 Conn. 756.

The primary use of the property here is an inn. Although the regulations do not define the term "inn," the evidence in the record before us indicates that the commission had used the Mayflower Inn, which, at all relevant times, was the only existing inn in town, "as a de facto model of what [the term] inn means in Washington." The record includes uncontroverted evidence that the Mayflower Inn featured a bar, two libraries, and "six separate" meeting areas.[45] The record also contains evidence that "all" of the accessory uses proposed by the applicant "are typical of what [i]nns do" and that the proposed uses in question were of "a smaller scale than what is currently offered [and] what has been offered at [the Mayflower Inn] for decades." On that evidence, the commission reasonably could find that the three uses in question had commonly, habitually, and by long practice been established as reasonably associated with the primary use of an inn in Washington. See *Loring* v. *Planning & Zoning Commission*, supra, 287 Conn. 754.

The plaintiffs further claim that the court misapplied the precedent of our Supreme Court in *Zachs* v. *Zoning Board of Appeals*, supra, 218 Conn. 324. We disagree. In *Zachs*, the court explained that, "[i]n deciding whether [a] current activity is within the scope of a nonconforming use consideration should be given to three factors: (1) the extent to which the current use reflects the nature and purpose of the original use; (2) any differences in the character, nature and kind of use involved; and (3) any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property." Id., 332. Here, the original use memorialized in the settlement agreement and the use approved by the granting of the modification application are one and the same: an inn on the property with accessory uses typical of inns in Washington. Indeed, the commission required, as the very first condition attached to its 2018 approval, that "[t]his approval remains *subject to all of the conditions and limitations* set forth in the settlement agreement approved by the commission on January 7, 2013, together with *the conditions* of approval that were incorporated into the commission's motion for approval of the settlement agreement." (Emphasis added.) Moreover, in approving the modification application, the commission imposed additional, more restrictive limitations on the use of the property.[46] Last, from the evidence adduced

at the public hearing, the commission reasonably could find that the use of the property proposed in the modification application would not result in a substantial difference in effect on the surrounding neighborhood.

In light of the foregoing, we conclude that there is evidence in the record to substantiate a finding that the proposed uses in question were within the scope of the lawful nonconforming use memorialized in the settlement agreement. The commission's determination that those uses constituted permissible accessory uses, therefore, was proper.

III

As a final matter, the plaintiffs claim that the court "failed to require compliance with [the] special permit standards" contained in the regulations. We do not agree.

"In an appeal from a decision of a zoning commission, the burden of overthrowing the decision . . . rest[s] squarely upon the appellant." (Internal quotation marks omitted.) *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. App. 602; see also *Blaker* v. *Planning & Zoning Commission*, 212 Conn. 471, 478, 562 A.2d 1093 (1989) (party challenging action of zoning commission bears burden of proving commission acted improperly); *Chouinard* v. *Zoning Commission*, 139 Conn. 728, 731, 97 A.2d 562 (1953) ("[t]he burden of proof is always on the plaintiff" who challenges zoning commission determination). On our review of the record before us, we conclude that the plaintiffs have not met that burden.

The plaintiffs contend that the commission's approval of the modification application contravened § 13.1.B of the regulations. That claim requires little discussion. Section 13.1.B of the regulations provides in relevant part: "[T]he Commission may approve, modify, or renew a Special Permit in a district where such uses are permitted. . . ." The regulations previously authorized the use of the property as an inn, and the settlement agreement approved by the Superior Court and filed in the Washington land records; see footnote 16 of this opinion; plainly permits the use of the property in that manner. The settlement agreement, to which the commission was a party, also provided a mechanism for the modification of the plans contained in that agreement, which required commission approval. See footnote 10 of this opinion. In light of those undisputed facts, the plaintiff's claim that the commission could not entertain an application to modify the plans contained in the settlement agreement is untenable.

The plaintiffs also argue that the commission failed to consider the standards set forth in §§ 13.1.C.1 and 13.1.C.2 of the regulations[47] and claim that the commission "did not make findings" related thereto. With respect to the latter contention, we already have noted

that the commission did not render a "formal, official, collective statement of reasons for its action"; *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 544, 600 A.2d 757 (1991); as required by General Statutes § 8-3c (b), and did not issue a detailed decision with explicit findings. See footnote 21 of this opinion. We are hesitant to ascribe fault in that regard, as noncompliance with that statutory imperative is commonplace in practice and condoned by decades of appellate authority.[48]

As our Supreme Court has observed, "an agency's statutorily required finding cannot be overruled simply because the agency's decision is not explicitly stated on the record." *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 595, 628 A.2d 1286 (1993). When a trial court's decision lacks specificity, this court presumes that the trial court made all necessary findings that are supported by the record. See, e.g., *Brett Stone Painting & Maintenance, LLC* v. *New England Bank*, 143 Conn. App. 671, 681, 72 A.3d 1121 (2013); *Young* v. *Commissioner of Correction*, 104 Conn. App. 188, 190 n.1, 932 A.2d 467 (2007), cert. denied, 285 Conn. 907, 942 A.2d 416 (2008). That precept applies equally to our review of the decisions of municipal land use agencies, whose conduct carries "a strong presumption of regularity . . . ." *Murach* v. *Planning & Zoning Commission*, 196 Conn. 192, 205, 491 A.2d 1058 (1985); see also *Hills* v. *Zoning Commission*, 139 Conn. 603, 608, 96 A.2d 212 (1953) (zoning commission action entitled to "every reasonable presumption of validity"); *Levine* v. *Zoning Board of Appeals*, 124 Conn. 53, 57, 198 A. 173 (1938) ("[t]here is a presumption that [municipal land use agencies] have acted . . . upon valid reasons"). When a zoning commission fails to articulate explicit factual findings to support its decision, a reviewing court is obligated to "search the entire record to find a basis for the commission's decision . . . . [I]f *any* reason culled from the record demonstrates a real or reasonable relationship to the general welfare of the community, the decision of the commission must be upheld." (Emphasis in original; internal quotation marks omitted.) *Graff* v. *Zoning Board of Appeals*, 277 Conn. 645, 670, 894 A.2d 285 (2006); see also *Azzarito* v. *Planning & Zoning Commission*, 79 Conn. App. 614, 618, 830 A.2d 827 (reviewing court must search record to find basis for decision when commission "did not make specific factual findings to support its approval of the application"), cert. denied, 266 Conn. 924, 835 A.2d 471 (2003).

The record here indicates that the commission, over the course of three lengthy nights of deliberations, gave ample attention to both the propriety and the impact of the proposed use of the property. The commission debated the impact of the proposed use on the surrounding neighborhood and discussed in detail both

parking and traffic concerns.[49] The commission also gave significant consideration to the intensity of the proposed use, which fostered disagreement among some commissioners. In addition, the commission considered the proposed use in relation to its rural setting, consistent with the stated purpose of the R-1 Farming and Residential zoning district. See footnote 4 of this opinion.

The record also indicates that the commission was cognizant of the fact that the only other inn in Washington was located "right down the road" from the property and had featured comparable primary and accessory uses "for decades." The commission reasonably could find, on the evidence adduced at the public hearing, that the existence of a similar inn in the same area of town supported a conclusion that the use proposed by the applicant comported with the intent and objectives of the regulations, as well as the town's plan of conservation and development. See Washington Zoning Regs., §§ 13.1.C.1 and 13.1.C.2.

Moreover, with respect to the impact on adjacent property, the commission was well aware of the protracted procedural history of this proposed use of the property and the fact that owners of surrounding properties had been involved in the 2008 special permit application proceedings, the 2013 settlement agreement proceedings, and the modification application now at issue. The record of both the public hearing and the commission's deliberations demonstrates that the commissioners were sensitive to the impact of the proposed use on the neighborhood, which led them to impose additional restrictions on the use of the property as conditions of their approval. See footnote 46 of this opinion.

In that vein, it bears emphasis that the proposal before the commission in 2018 was not a novel one. Both the use of the property as an inn and the "location, type, character, size, scale, proportion, appearance, and intensity" of that use; Washington Zoning Regs., § 13.1.C.2; had been the subject of various proceedings before the commission, as well as the Superior Court, over the course of a decade. On the evidence before it, the commission reasonably could conclude that the changes memorialized in the 2018 plan; see footnote 15 of this opinion; did not materially alter those considerations.

It is true that the commission did not explicitly reference each and every special permit standard contained in the regulations during its many hours of deliberations on August 7, 27 and 28, 2018. It remains that the commission engaged in detailed discussion as to the propriety of the proposed use, particularly with respect to its impact on the surrounding area, and imposed additional restrictions on the use of the property. On our thorough review of the record, we cannot agree with the plaintiffs'

contention that the commission ignored the considerations memorialized in §§ 13.1.C.1 and 13.1.C.2 of the regulations. To the contrary, the commission reasonably could conclude, on the basis of the documentary and testimonial evidence before it, that the use proposed by the applicant comported with the intent and objectives of the regulations, as well as the town's plan of conservation and development, and that the proposed use was in harmony with the orderly development of the town and surrounding neighborhood.

The plaintiffs, who bore the burden of proof in this administrative appeal, have not demonstrated that the modification application violated any special permit standard contained in the regulations. They thus have not rebutted the strong presumption of regularity that attaches to the conduct of zoning commissions in this state. See *Murach* v. *Planning & Zoning Commission*, supra, 196 Conn. 205; cf. *Frito-Lay, Inc.* v. *Planning & Zoning Commission*, supra, 206 Conn. 572–73 (presumption of regularity rebutted when record established that commission did not act within prescribed legislative powers). Accordingly, we conclude that the Superior Court properly dismissed the plaintiffs' appeal.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In their complaint, the plaintiffs also named Erika Klauer and Teresa Rosen Peacocke as defendants, as they were either parties to the settlement agreement at issue or successors to parties thereto.

[2] Unless otherwise indicated, all references to the regulations in this opinion pertain to the September 12, 2017 revision thereof.

[3] "In hearing appeals from decisions of a planning and zoning commission, the Superior Court acts as an appellate body." *North Haven Holdings Ltd. Partnership* v. *Planning & Zoning Commission*, 146 Conn. App. 316, 319 n.2, 77 A.3d 866 (2013).

[4] The regulations contain an explicit statement of purpose regarding the "R-1 Farming and Residential" zoning district. Section 4.1 of the regulations provides: "It is intended that development in this district, which covers most of the Town of Washington, will consist primarily of scattered residential, agricultural and related uses, open space, low intensity recreational activities, and other uses that will retain the rural character and natural beauty of the Town."

[5] The commission did not provide a collective statement of the reasons for its denial of the special permit, as required by General Statutes § 8-3c (b). See *Wykeham Rise, LLC* v. *Washington*, Superior Court, judicial district of Litchfield, Docket No. CV-09-4007939-S (October 11, 2011).

[6] For almost one century, the property was used for educational purposes. "From 1907 until 1988, the property was the site of the Wykeham Rise School, a private college preparatory boarding school for girls. In 1988, the property was sold to Swiss Hospitality Institute, which operated a postsecondary residential hotel school between 1992 and 2003." *Peacocke* v. *Zoning Commission*, Superior Court, judicial district of Litchfield, Docket No. CV-11-6003862-S (February 7, 2013).

[7] The sixteen conditions contained in the settlement agreement state:

"1. The Inn's complete site plan is represented in the attached document as Overall Site Plan for Applicant Matthew & Erika Klauer Development: Wykeham Project Date: July 8, 2011 Scale 1" = 60' SHEET 050.1 Revised to 11/19/12, Prepared by Arthur H. Howland & Associates P.C. ('Site Plan').

"2. The Inn will contain a maximum of fifty-four (54) guest room units ('Units').

"3. There will be a maximum of one hundred (100) parking spaces provided on the Property. There will be no 'overflow' parking.

"4. The Inn's restaurant shall be open to the public but shall have a total maximum seating capacity of sixty-eight (68) seats during normal operations,

excluding weddings, or 'paid for events.' Of the maximum seating capacity, no more than thirty (30) seats shall be outdoor seating.

"5. The Inn's spa and fitness center will be limited to the area within the building that is labeled 'Fitness Building' on the Site Plan and cannot exceed floor area totaling more than 11,400 square feet SAVE THAT a single exercise room no larger than 3,800 square feet and containing only exercise equipment may be located within the 'Main Building,' labeled as such as depicted on the Site Plan. If the single exercise room is located in the Main Building, the size of the Fitness Building would then be reduced by the same amount so that the combined floor area devoted to spa and fitness facilities in the Fitness Building and Main Building cannot exceed 11,400 square feet in total. There shall be no treatment rooms in the Main Building under any circumstances and treatment rooms in the Fitness Building may not be used for overnight stays. Wykeham will not issue 'day passes' for the spa and fitness center or for any such exercise room.

"6. The existing driveway of the Property that intersects Bell Hill Road will be permanently abandoned.

"7. There will be no amplified sound on the grounds or outside the footprints of all fully constructed and enclosed buildings at any time. Non-amplified sound is allowed; however, non-amplified music must cease 30 minutes after local sunset.

"8. The pool house shall be permitted to serve alcohol but will not have any grill or cooking equipment. There shall be no outside grill on the Property. The pool house and pool shall open no earlier than 8:00 a.m. and close no later than at 8:00 p.m. each day. Wykeham shall use best efforts to minimize noise or raucous behavior at the pool house or pool. All exterior lights shall be subject to the lighting standards of the [regulations] in effect at the time this Agreement is fully executed by the parties herein.

"9. There shall be no more than twenty-four (24) tented events between and only during the period from May 1 through October 31 of each calendar year and no more than one (1) tented event may be held per day. Tented events may be held in two general locations, the first being north of the Main Building (as those specific locations are depicted on the Site Plan) and the second being south of the Main Building (the specific south side locations are as depicted on the Site Plan.) Of the twenty-four (24) tented events, up to but no more than twelve (12) tented events may occur on the south side of the Main Building during any one calendar year. The balance of the twenty-four (24) total number of tented events that may be held in a calendar year, less the actual number of tented events not to exceed twelve (12) that occur on the south side in any calendar year, shall be allowed on the north side. No buildings, tents or other structures shall be constructed, placed or erected above, or on the ground in the Restricted Area as depicted on the Site Plan. No permanent or temporary parking is permitted in the Restricted Area. No food or beverages, including but not limited to, alcohol beverages, shall be prepared or served in the Restricted Area.

"10. A separate 'Stipulated Judgment' by and between Wykeham and Federer relating to *Wykeham Rise LLC* v. *Eric A. Federer, et ux.*, Docket No. LLI-CV-08-4007541-S, [judicial district] of Litchfield at Litchfield, will be signed by the parties therein and filed with the court for approval contemporaneously with the submission for approval of this Agreement by the court.

"11. Any amendments to this Settlement Agreement must be consented to by all the parties herein or their heirs, successors or assigns.

"12. If any provision of this settlement agreement is deemed unenforceable or against public policy by a court of competent jurisdiction, such provision shall be deemed severable from the remainder of the Agreement and shall not affect any other provision or, if such provision should not be wholly severable then, to the maximum extent possible, the remainder of this Agreement shall be modified so as to maintain the original intent and remain in full force and effect.

"13. Each of the parties represent that he, she or it has the complete authorization and power to execute this Agreement in an individual capacity, on behalf of an LLC, or Commission as the case may be and that all necessary approvals, signatures or consents of any other person or entity has been obtained and that this Agreement is a valid and binding obligation of the individuals, Wykeham Rise, LLC and the Commission and such Agreement does not violate any law, rule, regulation, contract or agreement otherwise enforceable against the respective parties.

"14. This settlement agreement shall be construed in accordance with the laws of the State of Connecticut.

"15. Once this Settlement Agreement has its Approval, Wykeham shall give up and surrender its two existing approvals for a school granted by the Commission on December 27, 2010, and February 14, 2012.

"16. This Settlement Agreement may be signed in counterparts and the parties may rely on facsimile or email copies provided to each as long as the originals are thereafter provided so that an original composed of all original counterparts may be presented to the Court for approval."

[8] The record before us contains the minutes of the January 7, 2013 special meeting and a partial transcript that was provided to the commission by Attorney Gail E. McTaggart as part of her memorandum to the commission dated July 23, 2018. In that memorandum, McTaggart states: "[E]xcluded [from the special meeting transcript] are [forty] minutes of public comment (and the few replies by [the commission's counsel and Wykeham's engineer]). Once public comment was closed, the remainder is fully transcribed, except for one [thirteen] minute discussion about construction on Sundays (and a brief discussion of building materials)."

[9] The transcript of the January 7, 2013 special meeting indicates that two architectural renderings were provided to the commission to illustrate the look of the proposed inn. Those renderings were offered in response to a question from the commission's administrative assistant, Janet M. Hill, who asked: "I thought the rustic country kind of architecture would be back, but now it sounds like we're at the school application [design] and you've got a factory warehouse. Which is it? For the architecture?" In response, Paul S. Szymanski, a civil engineer and president of Arthur H. Howland & Associates, P.C., stated: "We can give a—would you like a representative rendering for the record? It doesn't look exactly like the school." When Hill replied in the affirmative, Szymanski shared those renderings and explained that, "what we did was we significantly . . . improved the rooflines, adding gable ends throughout . . . breaking up the windows . . . adding additional glass in several places. . . . [A]nd breaking up what previously looked like one extended building." When the commission later prepared to make a motion to approve the settlement agreement, its legal counsel suggested referencing those "renderings," which were marked as "rendering 'A' and rendering 'B.' "

[10] A printed copy of one page of the commission's prior motion to approve the special permit to operate a school on the property, which contained seven conditions of approval, was marked "1/7/13 Proposed Conditions—No #5" and was signed by Chairman Gary Fitzherbert. One condition, which was listed as number five on that document and pertained to the sale of liquor, was crossed out. The remaining six conditions state:

"1. All modifications to the approved plans must be approved by the [commission] or its authorized agent prior to implementation,

"2. As-built drawings shall be submitted to the [commission] upon the completion of the foundations and again upon completion of framing. The as-built drawings must be approved by the [c]ommission or its authorized agent before commencement of further construction. The [c]ommission may, at the expense of the applicant, submit such drawings to a professional for evaluation,

"3. Outside construction may take place only between 7:00 a.m. and 5:00 p.m. Monday through Friday and between 8:00 a.m. and 4:00 p.m. on Saturday and Sunday. No blasting, no operation of heavy equipment, and no site work, are permitted on Saturday or Sunday, before 8:00 a.m. on Monday through Friday, and on Memorial Day, Fourth of July, and Labor Day,

"4. A performance bond, in the form of an irrevocable letter of credit from a financial institution with offices in Connecticut, in an amount to be determined in consultation with the [c]ommission's attorney, by an engineer approved by the [c]ommission and paid for by the applicant, shall be secured before disturbance of the site begins,

"[5.] The applicant shall, in addition to the proposed buffering, intersperse a sufficient number of evergreen trees with the existing and proposed vegetation to reasonably buffer the lower parking lot visibility from Wykeham Road, and

"[6.] Benchmark elevations for the building height shall be established for each building per Section 11.7.2.3 of the [regulations]."

[11] General Statutes § 8-8 (n) provides in relevant part: "No [zoning] appeal . . . shall be withdrawn and no settlement between the parties to any such appeal shall be effective unless and until a hearing has been held before the Superior Court and such court has approved such proposed withdrawal or settlement."

[12] On January 3, 2013, mere weeks before the settlement agreement was

approved by the court; see *Wykeham Rise, LLC* v. *Zoning Commission*, Docket No. CV-09-4007939-S, 2013 WL 951156 (Conn. Super. February 5, 2013); the plaintiffs, along with Mitchell J. Solomon, trustee for the Mitchell J. Solomon Revocable Trust, filed a motion to intervene in the pending appeal of the commission's 2008 decision to deny Wykeham's special permit request. In denying that motion, the court stated in relevant part: "The appeal began on December 29, 2008, and the motion to intervene was not filed until January 3, 2013, a delay of four years. The appeal has already been heard and decided by the Superior Court and appealed to the Appellate Court. The proposed intervenors admit in their motion to intervene that they 'have a track record of involvement in various zoning applications filed by the plaintiff for the same property as the subject appeal.' They make the extremely weak argument that they decided not to intervene in this case because it involves a denial of the project. They must have been well aware that three other neighbors intervened and that the appeal to the Appellate Court would involve a preargument conference for the purpose of trying to settle the matter. It is hard to imagine a more untimely motion to intervene. The delay and prejudice to the present parties would be extreme if the motion to intervene is granted. The parties have spent considerable time and expense to bring the appeal to the point that . . . it can be settled. The intervention would prevent the settlement from taking place because the proposed intervenors oppose it and there can be no settlement if one or more of the parties to the case do not support it." *Wykeham Rise, LLC* v. *Zoning Commission*, Superior Court, judicial district of Litchfield, Docket No. CV-09-4007939-S (February 4, 2013) (55 Conn. L. Rptr. 479, 480).

[13] No appeal was taken from the judgment approving the settlement agreement. In all subsequent proceedings before the commission and the Superior Court, the parties agreed that the commission's 2013 approval of the settlement agreement was tantamount to special permit approval to construct an inn on the property in accordance with the 2012 plan and the conditions specified in the settlement agreement, and no claim to the contrary has been raised in this appeal. Indeed, the plaintiffs repeatedly refer to the "2013 special permit" in their principal appellate brief.

[14] The 2018 plan was revised further on March 20, June 18 and July 2, 2018, in ways immaterial to the present appeal.

[15] As part of that application, the applicant submitted a letter from Paul S. Szymanski, a civil engineer and president of Arthur H. Howland & Associates, P.C., "to clarify and note all modifications [contained in the 2018 plan] in comparison to the original approved site plan as part of the settlement agreement. These are the only modifications to the [2012 plan] requested:

"1. Regrading along the rear and east side of the Main Building.

"2. Addition of a retaining wall on the east side of the building and minor modification to the existing retaining wall already approved on the east side of the Main Building.

"3. Removal of the [twenty air conditioning] pads at the rear of the Main Building.

"4. Addition of [three] emergency egress landings at the Main Building, [three] emergency egress landings at the Pool House (added since last Public Hearing) and [one] emergency egress landing at the Spa House (added since last Public Hearing) with associated gathering areas and pathways to comply with the Building Code.

"5. Since the last Public Hearing, addition of a pull-off area approximately [five foot by twenty foot] adjacent to the driveway in front of the Spa House to satisfy Building Code requirements [of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 et seq.]. This necessitated moving the Spa House [five] feet closer to the drive."

Paul S. Szymanski concluded that letter by stating that "[t]hese are the *only* revisions being requested and are graphically represented on [the 2018 plan]." (Emphasis in original.)

[16] The commission's notice of approval of the settlement agreement was filed in the Washington land records at volume 231, pages 1131–32.

[17] Meetings scheduled for May 15 and June 25, 2018, were cancelled due to a tornado warning in the area and a continuance request, respectively.

[18] In addition to testimonial evidence presented at the public hearing, the commission received a written "side-by-side comparison" of the applicant's proposal and the Mayflower Inn, which states in relevant part: "Mayflower has thirty units while [the applicant's proposal] plans to have thirty-seven units. Fifty-four units were approved by the settlement agreement . . . yet only thirty-seven are planned—seven more than the Mayflower. Mayflower has nine buildings while [the applicant's proposal] will have six. Both [the

applicant's proposal] and Mayflower have a restaurant with an accompanying bar—Mayflower has eighty-five dining seats while [the applicant's proposal] has sixty-eight. Mayflower is able to have outdoor dining as well on its porch which would add seats—but [the applicant's proposal] is limited to sixty-eight seats and only thirty of those can be moved outside. [The applicant's proposal] is limited to twenty-four maximum outdoor events such as weddings per year while Mayflower has indicated nearly 100 weddings are held every year. Mayflower has two gyms—one in its main building and one in its spa. Mayflower offers memberships at both venues. [The applicant's proposal] has only one spa. The dedicated spa building at Mayflower is 20,000 square feet (this does not include the square footage of gym space in the main building) while [the applicant's proposed] spa and gym will be under 11,000 square feet. The Mayflower has tennis courts—[the applicant's proposal] will have none. The Mayflower has two libraries and reading rooms—[the applicant] plans to have one. Mayflower has six separate venues for ballroom/meeting rooms while [the applicant's proposal] will have two. The total square footage of the various Mayflower meetings spaces is over 5000 square feet while [the applicant's proposal] is 3500 [square feet]. Mayflower also has a dedicated business center; one is not planned at this time [in the applicant's proposal]. Mayflower has two gift shops—[the applicant's proposal] has . . . one. Mayflower has two swimming pools—one indoor and one outdoor—[the applicant's proposal] will have only one. The total number of parking spaces is ninety-five at Mayflower and 100 for [the applicant's proposal]. What is clear here is that all of these offerings and attributes are typical of what Inns do. As the Chairman [of the commission] says—the definition of an 'inn' is governed by the one that still exists in Washington. [The applicant] is not proposing to do anything that the Mayflower is not already [doing, and in] every [instance] save room count, [the applicant's] planned activities are [of] a smaller scale than what is currently offered—and what has been offered at Mayflower for decades."

[19] Of the eight members on the commission, only three—Nicholas N. Solley, David Werkhoven, and Raymond W. Reich—had served on the commission when the settlement agreement was approved in 2013. Those three members all voted to approve the 2018 modification request.

[20] The conditions attached to the commission's approval state:

"1. This approval remains subject to all of the conditions and limitations set forth in the settlement agreement approved by the commission on January 7, 2013, together with the conditions of approval that were incorporated into the commission's motion for approval of the settlement agreement.

"2. The commission finds that the separate ownership of guest room units is inconsistent with its interpretation of the word 'inn' as used in the [regulations]. An 'inn' is a lodging facility owned and managed by a single ownership entity, with rooms available for transient occupancy by lessees. Therefore, a condition of approval is that the 'inn' must be owned as an undivided property. Guest room units, however they may be designated, may not be separately owned.

"3. No guest room units shall have a kitchen.

"4. No guest room unit shall contain a refrigerator having a capacity larger than 4.0 cubic feet.

"5. No guest room unit shall have a stove, stove top, oven or convection oven.

"6. No guest room unit shall have any cooking facilities, including microwave ovens.

"7. No guest room unit shall have a dishwasher.

"8. No guest room unit shall have a washing machine or dryer.

"9. The interior floor plans shall be modified to eliminate the ballroom, because that use was neither contemplated nor approved in 2013 and, [without reductions in the uses actually approved in 2013], would expand or extend the nonconforming nature of the principal use. In addition, the applicant failed to prove that 100 parking spaces allowed under the 2013 approval would be adequate to accommodate the additional use.

"10. The emergency accessway shall be used for emergency purposes only and shall not be used to service the pool, poolhouse, or tented vans.

"11. As-built drawings shall be submitted to the [commission] upon the completion of the foundations and again upon the completion of framing. The as-built drawings must be approved by the commission or its authorized agent(s) before commencement of further construction. The commission shall, at the expense of the applicant, refer such drawings to a professional engineer and/or a surveyor for review.

"12. Outside construction may take place only between 7:00 a.m. and 5:00 p.m. Monday through Friday and between 8:00 a.m. and 4:00 p.m. Saturday and Sunday. No blasting, no operation of heavy equipment, and no site work are permitted on Saturday or Sunday, before 8:00 a.m. Monday through Friday, and on Memorial Day, Fourth of July, and Labor Day.

"13. In accordance with Section 13.4 of the [regulations], a performance bond, in the form of a cash bond or an irrevocable letter of credit from a financial institution with offices in Connecticut, in an amount and for items to be determined by the commission in consultation with the commission's attorney and/or by an engineer approved by the commission and paid for by the applicant, shall be secured before disturbance of the site begins.

"14. No day passes or memberships of any kind may be issued for the spa, which is to be used by overnight guests only.

"15. No day passes or memberships of any kind may be issued for the pool, which is to be used by overnight guests only.

"16. The finish floor levels for the main inn building shall not exceed those shown on Sheet SD.1, revised to 12/17/12 as was approved in the [settlement agreement].

"17. The main inn building is limited to five levels: two underground and three above ground.

"18. Outdoor lighting must comply with the requirements of Section 12.15 of the [regulations]. A plan for all such lighting must be submitted to and approved by the [commission] prior to the commencement of any construction.

"19. All cottages shall be limited to two floors only per Sheet SD.1, revised to 12/17/12.

"20. There shall be no kitchen in the pool house.

"21. Written approval by the fire marshal shall be submitted to the commission prior to the issuance of the special permit.

"22. Written approval by the [Department of Energy and Environmental Protection] of the final septic plans shall be submitted to the commission prior to the issuance of the special permit.

"23. Written approval by Aquarion Water Company of the final plans for the water supply shall be submitted to the commission prior to the issuance of the special permit and shall include (a) determination that the water supply is adequate to service the 'inn' and sprinkler systems, and (b) a statement of how many additional wells will be needed and where they will be located. The applicant must also provide the commission with a signed statement that it agrees to pay for all required system improvements. . . .

"24. Any further modifications to any of the approved plans . . . must be submitted to and approved by the [commission] prior to implementation.

"25. No passenger drop offs by buses carrying fifteen passengers or more." (Citation omitted.)

[21] While the record indicates that commission members engaged in extensive deliberations over several nights during which they expressed their individual views on a variety of issues, the commission nonetheless did not furnish "a formal, official, collective statement of reasons for its action." *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 544, 600 A.2d 757 (1991); see also *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 673–76, 111 A.3d 473 (2015) (neither individual reasons stated by land use agency members during deliberations nor remarks of member in making motion to grant application constitute collective statement). As a result, this court is obligated, pursuant to well established precedent, to search the entire record to ascertain whether the evidence reveals any proper basis for the commission's decision to approve the modification application. See *Harris* v. *Zoning Commission*, 259 Conn. 402, 423, 788 A.2d 1239 (2002).

[22] "[P]ursuant to . . . § 8-8 (a), a person may derive standing to appeal based solely upon his status as an abutting landowner or as a landowner within 100 feet of the subject property." *Pierce* v. *Zoning Board of Appeals*, 7 Conn. App. 632, 635–36, 509 A.2d 1085 (1986).

[23] Although § 8-8 (o) has been amended since the events at issue, that amendment is not relevant to this appeal. We therefore refer to the current revision of § 8-8 (o).

[24] In its appellate brief, the commission maintains that, given the particular facts and circumstances now before us, the principles governing nonconforming uses do not apply to this appeal.

[25] See, e.g., *McMahon* v. *Board of Zoning Appeals*, 140 Conn. 433, 101 A.2d 284 (1953); cf. *MacKenzie* v. *Planning & Zoning Commission*, 146 Conn. App. 406, 427–30, 77 A.3d 904 (2013) (variance power rests exclusively with zoning board of appeals).

[26] See also Washington Zoning Regs., § 17.3.A ("no such nonconforming use shall be enlarged or increased, nor extended to occupy a greater area of the lot than was occupied at the time such use became nonconforming under these [r]egulations"); Washington Zoning Regs., § 17.4.A ("[N]o such nonconforming structure may be enlarged, extended, or otherwise altered in such a way as to increase the area, volume, or percentage of the structure that is nonconforming or to create, increase, enlarge, or extend any other

nonconformity as to the structure or the lot. This prohibition includes, but is not limited to, any horizontal or vertical extension or expansion of a structure within a required setback area."). The regulations similarly provide that, "[o]n any nonconforming structure or portion of a structure containing a nonconforming use, repairs and maintenance may be done provided that the nonconforming aspects of the structure (e.g., setbacks from lot lines, height), as well as the cubic content of the nonconforming portions of the structure *shall not be increased.* . . . Any nonconforming structure that has been damaged by fire, explosion, or act of nature may be repaired, rebuilt, or replaced within two years of such damage, provided that such repairs, rebuilding, or replacement *does not extend nor expand any nonconforming aspect* of the affected building." (Emphasis added.) Washington Zoning Regs., § 17.8.

[27] A setback is "a zoning limitation that prohibits construction" within a specified distance from a property line. *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 200 n.2, 658 A.2d 559 (1995); see also *Vivian* v. *Zoning Board of Appeals*, 77 Conn. App. 340, 350, 823 A.2d 374 (2003) ("[t]he setback is the distance between the point where a building touches the ground and the property line"); Black's Law Dictionary (9th Ed. 2009) p. 1496 (defining setback as "[t]he minimum amount of space required between a lot line and a building line"). The regulations here define "setback" in relevant part as "the shortest distance from a structure to a lot line, public right of way, or wetland or watercourse. . . ." Washington Zoning Regs., § 21.1.60.

[28] See *Simko* v. *Ervin*, 234 Conn. 498, 509, 661 A.2d 1018 (1995) (*Berdon, J.*, dissenting) ("the term 'footprint' . . . is commonly used, and universally understood, to refer to the boundaries of a building"); *Campbell* v. *Tiverton Zoning Board*, 15 A.3d 1015, 1020 (R.I. 2011) (defining footprint as "the exterior perimeter of the foundation" of structure); Black's Law Dictionary (9th Ed. 2009) p. 717 (defining footprint in land use context as "[t]he shape of a building's base").

[29] The plaintiffs concede that the main building depicted in the 2012 plan is a lawful use. In their principal appellate brief, they state in relevant part: "The main building . . . stands approved in 2013, and is therefore 'lawful' . . . ."

[30] Our review of the record indicates that all parties that participated in the commission's review of Wykeham's 2008 special permit application, as well as all parties to the 2013 settlement agreement and the hearing before the Superior Court, overlooked this specific setback requirement. The regulations in this regard may have contributed to the confusion, as they contain multiple setback requirements that ostensibly could apply to the property. Section 11 of the regulations is titled "Density, Lot Size, and Other Dimensional Requirements." Section 11.6.1.A then specifies a thirty foot "[r]ear" and a fifteen foot "[s]ide" setback requirement "[f]or buildings and structures used in part or wholly for [b]usiness." The site plans submitted as part of Wykeham's proposal, and the 2012 plan in particular, contain a yellow boundary that is labeled "30 [Foot] Side Yard."

Section 11.6.1 nonetheless includes a crucial condition to those setback requirements, stating that they apply "[u]nless otherwise specified in the particular zone for a commercial lot . . . ." Section 13.9.B, in turn, specifies the minimum setback requirements for "any structure" constructed as part of a "Tourist Home or Inn." Because the proposed use of the property indisputably is as an inn, the fifty foot lot line setback of § 13.9.C applies to the main building, which lies thirty-one feet from the side lot line on the 2012 plan.

In *Torrington* v. *Zoning Commission*, 261 Conn. 759, 770, 806 A.2d 1020 (2002), a municipal zoning commission entered into a settlement agreement that "varied to some extent the zoning regulations applicable to the property in question" despite the fact that the variance power is statutorily allocated to the zoning board of appeals. In rejecting a challenge to the propriety of that settlement agreement, our Supreme Court explained that "[i]t is not enough that the conduct in question was in violation of the applicable zoning statutes or regulations. It must be shown that the conduct was so far outside what could have been regarded as a valid exercise of zoning power that there could not have been any justified reliance on it." Id., 768. The court emphasized that the zoning commission's decision to enter into the settlement agreement "served to settle a vigorously contested appeal"; id., 770; and that the plaintiff challenging the propriety of that agreement "does not contend that the [settlement agreement] was the product of bad faith, collusion, or other improper conduct." Id., 771. Perhaps most importantly, the court noted that "it was not entirely obvious that the [zoning] commis-

sion's conduct in entering into the [settlement agreement] was outside its purview." Id., 770. For those reasons, the court concluded that the parties reasonably could rely on that settlement agreement. See id., 776. That logic applies equally to the present case.

[31] See Washington Zoning Regs., § 17.1 ("It is . . . the intent of these Regulations that the nonconforming aspects of [any nonconforming] lots and structures shall not be enlarged, expanded, or extended . . . . A nonconforming use of a structure . . . shall not be extended, expanded, or enlarged . . . ."); Washington Zoning Regs., § 17.4.A ("[N]o such nonconforming structure may be enlarged, extended, or otherwise altered in such a way as to increase the area, volume, or percentage of the structure that is nonconforming or to create, increase, enlarge, or extend any other nonconformity as to the structure or the lot. This prohibition includes, but is not limited to, any horizontal or vertical extension or expansion of a structure within a required setback area.").

[32] The January 7, 2013 motion to approve the settlement agreement states in relevant part: "The [commission] hereby approves the [s]ettlement [a]greement . . . per the [2012 plan], the architectural renderings, A and B . . . and the [six] proposed conditions of approval . . . ."

[33] The 2018 plan contained two minor alterations that are not in dispute. Three emergency egress landings and a five by twenty foot pull-off area were added to comply with building code requirements and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 et seq. On appeal, the plaintiffs do not claim that those additions constituted an impermissible expansion of a nonconforming structure. Indeed, such modifications of nonconforming structures are permitted under the regulations. See Washington Zoning Regs., § 17.8 ("[n]othing in these Regulations shall be deemed to prohibit any modifications that are determined . . . to be necessary to strengthen or restore to a safe condition any structure or part thereof").

[34] See Washington Zoning Regs., § 17.4.A ("[N]o such nonconforming structure may be enlarged, extended, or otherwise altered in such a way as to increase the area, volume, or percentage of the structure that is nonconforming . . . . This prohibition includes . . . vertical extension or expansion of a structure within a required setback area.").

[35] The one condition tangentially related to the issue of height pertained to its method of calculation. When the commission approved the settlement agreement on January 7, 2013, the sixth condition imposed by the commission stated: "Benchmark elevations for the building height shall be established for each building per Section 11.7.2.3 of the [regulations]." Section 11.7.2.3 of the regulations provides: "For purposes of determining the total vertical height and mean height of a structure, please refer to the definitions in Section 21 of 'Average Finished Grade' and 'Average Pre Existing Grade.' This average must be determined in the field prior to any site disturbance. A benchmark elevation distinguished and defined from the pre existing average grade must be marked on site and mapped prior to any land disturbance. This benchmark shall be maintained throughout the duration of construction and used to confirm the total vertical height and mean height of the structure after construction."

[36] Neither the school plans nor the discharge permit plans were submitted to the commission in connection with the January 7, 2013 special meeting.

[37] In a letter to the commission that was submitted as part of the 2018 public hearing on the modification application, Owens stated in relevant part that the architectural renderings "are computer generated, [three]-dimensional depictions of a specific building design . . . . They convey quantifiable height, shape, volume and number of stories. The renderings correlate directly to [the discharge permit plans]. There is *NO INTENT* to suggest that the [discharge permit plans] are relevant to any issue other than establishing architectural characteristics of [the architectural renderings]. [The discharge permit] plans were not part of the settlement agreement." (Emphasis in original.) In comparing his analysis of the dimensions of the architectural renderings, Owens opined that the main building depicted on the 2018 plan was approximately six feet and seven inches taller than the architectural renderings.

[38] Our decisional law commonly refers to the "testimony" offered at the public hearings of municipal land use agencies in this state without regard to whether it was offered under oath. See, e.g., *Anatra* v. *Zoning Board of Appeals*, 307 Conn. 728, 745, 59 A.3d 772 (2013) (explaining that "the testimony at the hearing" is relevant to proper construction of variance granted by board); *Alvord Investment, LLC* v. *Zoning Board of Appeals*, 282 Conn. 393, 415, 920 A.2d 1000 (2007) ("the issue was raised in the testimony before the board at the public hearing" (emphasis omitted)); *Jalowiec Realty*

*Associates, L.P.* v. *Planning & Zoning Commission*, 278 Conn. 408, 411, 898 A.2d 157 (2006) (zoning commission continued public hearing "[a]fter hearing testimony from the plaintiff's experts and from members of the public"); *Cameo Park Homes, Inc.* v. *Planning & Zoning Commission*, 150 Conn. 672, 678, 192 A.2d 886 (1963) ("[n]o testimony was offered at the hearing before the commission"); *Cornacchia* v. *Environmental Protection Commission*, 109 Conn. App. 346, 353, 951 A.2d 704 (2008) (noting that "the court relied on testimony from the public hearing" in concluding that substantial evidence existed to support commission's denial of permit); *Urbanowicz* v. *Planning & Zoning Commission*, 87 Conn. App. 277, 297, 865 A.2d 474 (2005) ("the commission heard testimony on the [special permit] application"); *Children's School, Inc.* v. *Zoning Board of Appeals*, 66 Conn. App. 615, 630, 785 A.2d 607 (noting that zoning board "was entitled to credit the testimony . . . adduced during the four days of public hearings"), cert. denied, 259 Conn. 903, 789 A.2d 990 (2001).

In *Parsons* v. *Board of Zoning Appeals*, 140 Conn. 290, 292–93, 99 A.2d 149 (1953), our Supreme Court explained that "[p]roceedings before an administrative board are informal. . . . Such a board is not bound by the strict rules of evidence. . . . The only requirement is that the conduct of the hearing shall not violate the fundamentals of natural justice. That is, there must be due notice of the hearing, and at the hearing no one may be deprived of the right to produce relevant evidence or to cross-examine witnesses produced by his adversary . . . ." (Citations omitted.) For that reason, "[t]here is no legal requirement that witnesses before a municipal land use agency must take an oath before testifying." 9 R. Fuller, Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 20:11, p. 611; see also *Loring* v. *Planning & Zoning Commission*, 287 Conn. 746, 758, 950 A.2d 494 (2008) ("[a]n unsworn statement of a party's counsel is competent evidence before a zoning body"); *Parsons* v. *Board of Zoning Appeals*, supra, 293 (board entitled to accept unsworn statements); *Wheeler* v. *Cosgrove*, Superior Court, judicial district of New Haven, Docket No. CV-17-6074630-S (December 12, 2019) (zoning hearings "do not require the swearing in of witnesses so long as an opportunity to refute their testimony is provided"); 1 P. Salkin, American Law of Zoning (5th Ed. 2021) § 8:16 ("[u]nsworn testimony may be received" at zoning hearing). Because the record reflects that the parties were afforded the opportunity to refute the unsworn testimony offered by Szymanski and others at the public hearing, the commission was entitled to consider that testimony.

[39] The minutes of the commission's August 7, 2018 deliberations likewise indicate that Solley "stated that [in 2013, the commission] did not deliberate over elevations or [floor plans] because there were none submitted with the site plan."

[40] With respect to the proposed restaurant, the settlement agreement states in relevant part: "The Inn's restaurant shall be open to the public but shall have a total maximum seating capacity of sixty-eight (68) seats during normal operations, excluding weddings, or 'paid for events.' Of the maximum seating capacity, no more than thirty (30) seats shall be outdoor seating."

[41] With respect to the proposed spa and fitness center, the settlement agreement states in relevant part: "The Inn's spa and fitness center will be limited to the area within the building that is labeled 'Fitness Building' on the Site Plan and cannot exceed floor area totaling more than 11,400 square feet SAVE THAT a single exercise room no larger than 3,800 square feet and containing only exercise equipment may be located within the 'Main Building,' labeled as such as depicted on the Site Plan. If the single exercise room is located in the Main Building, the size of the Fitness Building would then be reduced by the same amount so that the combined floor area devoted to spa and fitness facilities in the Fitness Building and Main Building cannot exceed 11,400 square feet in total. There shall be no treatment rooms in the Main Building under any circumstances and treatment rooms in the Fitness Building may not be used for overnight stays. Wykeham will not issue 'day passes' for the spa and fitness center or for any such exercise room."

[42] With respect to tented events, the settlement agreement states in relevant part: "There shall be no more than twenty-four (24) tented events between and only during the period from May 1 through October 31 of each calendar year and no more than one (1) tented event may be held per day. Tented events may be held in two general locations, the first being north of the Main Building (as those specific locations are depicted on the Site Plan) and the second being south of the Main Building (the specific south side locations are as depicted on the Site Plan.) Of the twenty-four (24) tented events, up to but no more than twelve (12) tented events may occur on the south side of the Main Building during any one calendar year. The balance of the twenty-four (24) total number of tented events that may be

held in a calendar year, less the actual number of tented events not to exceed twelve (12) that occur on the south side in any calendar year, shall be allowed on the north side. No buildings, tents or other structures shall be constructed, placed or erected above, or on the ground in the Restricted Area as depicted on the Site Plan. No permanent or temporary parking is permitted in the Restricted Area. No food or beverages, including but not limited to, alcoholic beverages, shall be prepared or served in the Restricted Area."

[43] Detailed floor plans are not required for the issuance of a special permit under the regulations. See Washington Zoning Regs., §§ 13.4 and 14.3.

[44] The proposed bar, "prefunction" meeting area, and meeting room/library all are located in the main building.

[45] The modification application approved by the commission here contained a bar, one "meeting room/library," and one "prefunction" meeting area.

[46] For example, the commission required the applicant to eliminate the proposed ballroom from the 2018 plan, prohibited the issuance of day passes for the spa and pool areas, and prohibited "passenger drop offs by buses carrying [fifteen] passengers or more." The commission required the main building to be "limited to five levels" and further specified that its "finished floor levels . . . shall not exceed those shown on Sheet SD.1 . . . ." The commission also prohibited individual ownership of guest room units and mandated that guest room units shall not have (1) "a kitchen"; (2) "any cooking facilities," including "a stove, stove top, oven or convection oven"; (3) "a dishwasher"; (4) "a washing machine or dryer"; or (5) a "refrigerator having a capacity larger than 4.0 cubic feet." See footnote 20 of this opinion.

[47] Subparagraph 1 of § 13.1.C.1 provides in relevant part: "That the proposed use and any building or other structure in connection therewith are consistent with the objectives of the Plan of Conservation and Development . . . and the intent and requirements of the Zoning Regulations as such documents may be amended." Washington Zoning Regs., § 13.1.C.1.

Subparagraph 2 of § 13.1.C.2 provides: "That the location, type, character, size, scale, proportion, appearance, and intensity of the proposed use and any building or other structure in connection therewith shall be in harmony with and conform to the appropriate and orderly development of the Town and the neighborhood and will not hinder or discourage the appropriate development and use of adjacent property or substantially or permanently impair the value thereof." Washington Zoning Regs., § 13.1.C.2.

[48] See, e.g., *Rapoport* v. *Zoning Board of Appeals*, 301 Conn. 22, 34, 19 A.3d 622 (2011); *Harris* v. *Zoning Commission*, 259 Conn. 402, 420–21, 788 A.2d 1239 (2002); *Paige* v. *Town Plan & Zoning Commission*, 235 Conn. 448, 464, 668 A.2d 340 (1995); *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 220 Conn. 544–45; *Ward* v. *Zoning Board of Appeals*, 153 Conn. 141, 144, 215 A.2d 104 (1965); *Turek* v. *Zoning Board of Appeals*, 196 Conn. App. 122, 136–37, 229 A.3d 737, cert. denied, 335 Conn. 915, 229 A.3d 729 (2020); *Verrillo* v. *Zoning Board of Appeals*, supra, 155 Conn. App. 672–76; *Malone* v. *Zoning Board of Appeals*, 134 Conn. App. 716, 724, 39 A.3d 1233 (2012); *200 Associates, LLC* v. *Planning & Zoning Commission*, 83 Conn. App. 167, 177–78, 851 A.2d 1175, cert. denied, 271 Conn. 906, 859 A.2d 567 (2004). As one commentator has observed, "Connecticut's various land regulation statutes all provide . . . that commissions 'shall' state the reasons for their decisions on the record. However, Connecticut courts have consistently refused to void decisions made without a statement of reasons, even though all these statutes use 'shall' rather than 'may.' " (Footnote omitted.) T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) pp. 473–74; cf. *Gagnon* v. *Inland Wetlands & Watercourses Commission*, 213 Conn. 604, 611, 569 A.2d 1094 (1990) (public policy reasons make it "practical and fair" for reviewing court to search record of "a local land use body . . . composed of laymen whose procedural expertise may not always comply with the multitudinous statutory mandates under which they operate").

[49] During the public hearing, the commission heard expert testimony from Szymanski that the 100 parking spaces reflected on the 2018 plan would be adequate to accommodate the proposed use of the property. That testimony was acknowledged during the commission's deliberations.